ALLMAND ASSOCIATES, INC., Plaintiff, Counter-defendant, and Defendant,

v.

**HERCULES INCORPORATED,**
Defendant, Counter-plaintiff,
and Plaintiff.

Civil Action Nos. 93–40524, 93–40529.

United States District Court,
E.D. Michigan,
Southern Division.

March 31, 1997.

Mayer Morganroth, Morganroth & Morganroth, Southfield, MI, for plaintiff, counter–defendant, and defendant.

Jack O. Kalmink, Dirk H. Beckwith, Detroit, MI, for defendant, counter–plaintiff, and plaintiff.

### OPINION AND ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

GADOLA, District Judge.

This case involves a commercial dispute between Allmand Associates, Inc., a Michigan corporation and Hercules Incorporated, a Delaware corporation. The dispute arises out of a relationship founded in 1989, which was abruptly severed in 1993. Presently before this court are three motions for summary judgment filed by defendant Hercules Incorporated. Upon conducting a thorough review of the record in addition to holding oral argument in this matter on January 29, 1997, this court will grant defendants' motions.

### FACTS [1]

Hercules Incorporated ("Hercules") is the owner, seller, developer and marketer of the METTON® process-a unique operation used to fabricate molded plastic products. The process involves placing two liquid reactants ("METTON® liquid molding resins") into a molder, where they amalgamate and form a molded product. In an effort to expand its business, Hercules approached Allmand Associates, Inc. ("Allmand"), a fabricator and marketer of molded products such as car and minivan fenders, snowmobile hoods, and automobile instrument panels, with the possibility of using METTON® technology. In particular, Hercules solicited Allmand because it wanted to introduce METTON® to the automotive industry.

In 1989 and 1990, numerous meetings between Allmand's and Hercules' representatives took place in order to familiarize Allmand with METTON® and to convince Allmand to sign a license. In fact, by the middle of 1990, Hercules' representatives were at Allmand on a constant basis in order to persuade them to enter into a contract with Hercules. At these meetings, various representations were made to Allmand by Hercules' personnel. For instance, Gladstone Trotman, Hercules' Marketing Development Manager, represented to Nicholas Bogdanos, General Manager at Allmand, that METTON® would enable Allmand to make high volume parts under low pressures and increase its customer base. He also characterized METTON® as an extremely versatile liquid resin that was tougher, lighter, more cost efficient and more flexible in design capability than other engineering compounds and that it had the potential of molding ribs and bosses with a Class A surface and no sinks or indentations. Statements were made by Trotman and Garland Lee, Hercules' Marketing Manager, that the cycle time for molding with Hercules' product would be 2.5 to 3.5 minutes, that secondary finishing was not required, that only minimal cleaning would be required and that the parts produced by METTON® would be easily

---

**1.** For purposes of deciding the motions for summary judgment currently before this court, the facts as delineated by plaintiff Allmand Associates, Inc. will be accepted as true.

paintable. Also, Hercules' employees told Allmand employees that METTON® would be compatible with Allmand's zinc alloy ("Kirksite") tools. Many of these oral representations were corroborated by sales brochures and cost models prepared by Hercules and given Allmand.

Eventually, on October 11, 1990, Hercules and Allmand entered into two agreements: (1) the Codevelopment Agreement and (2) the General Molder License Agreement ("GML Agreement"). The Codevelopment Agreement was a one-year contract, under which Hercules' was obligated to provide free of charge, a quantity of METTON® liquid molding resins (not to exceed 12,000 pounds) to be used by Allmand for the production of prototype plastic components. Pursuant to the Codevelopment Agreement, Hercules also promised to provide consulting services and other necessary design and technical assistance to Allmand, including accompanying Allmand on customer calls. The Codevelopment Agreement required Allmand to manufacture components with METTON® and carry out sufficient market research and testing of such components to determine the feasibility of using METTON® in its production process. The Codevelopment Agreement made clear that each party was responsible for the expenses it incurred in fulfilling its duties under the contract, and nothing in said agreement was to "be deemed to constitute the parties as partners, joint venturers, an association or any other type of joint entity."

The second contract entered into on October 11, 1990 was the GML Agreement. Basically, this contract gave Allmand a non-exclusive license to use METTON® technology and patent rights and also obligated Allmand to purchase its entire requirement of METTON® liquid reactants from Hercules. As consideration, Allmand was to pay an initial royalty fee of $50,000, in addition to 7.5¢ per pound of METTON® liquid resin purchased. Under the GML Agreement, Hercules promised to do several things such as: (1) disclose manufacturing information,

(2) furnish normal technical assistance of the type usually associated with the sale of polymer products, and (3) provide services of personnel skilled in polymerization of METTON® liquid molding resins to assist Allmand during the design, procurement and start-up of a facility for manufacturing molded articles using METTON®.

On January 24 and July 31, 1991, Allmand entered into LMR Equipment Sales Agreements for the purchase of equipment to be used in the molding of METTON®. The LMR Agreements provided that Allmand was to use the equipment "solely for the purpose of molding production or prototype parts using Hercules' liquid molding resins." The contracts also granted Hercules a security interest in the equipment.[2]

In 1991, Hercules began shipping METTON® liquid molding resin to Allmand. With each order Hercules received, Hercules would mail an "Order/Acknowledgment Form" to Allmand. The Form indicated that "acknowledgment of your [Allmand's] order [was] expressly made conditional on your [Allmand's] assent to the terms and conditions stated above and on the reverse side hereof, and we [Hercules] agree to furnish the material upon these terms and conditions only." The term most relevant to the instant dispute, which appeared on the reverse side of the Order/Acknowledgment Form read as follows:

Seller warrants that the materials sold hereunder shall be of Seller's standard quality, but Buyer assumes all risk and liability whatsoever resulting from the possession, use or disposition of such materials, whether used singly or in combination with other substances. Liability of Seller to Buyer, if any hereunder, for breach of contract, negligence, or otherwise, shall in no event exceed in amount the purchase price of the materials sold with respect to which any damages are claimed. Within thirty (30) days after any shipment reaches its destination (but in no event later than ninety (90) days after shipment leaves Seller's plant) the materials shall be examined

**2.** Hercules subordinated its security interest to Machine Tool Finance Corporation on August 24, 1992.

and tested, and promptly thereafter and before the materials are used, Seller's shall be notified in writing or by cable in case the materials are found defective or short in any respect. Failure to so notify the Seller shall constitute a waiver of all claims with respect to the materials, and in any event the use of the materials shall be deemed to mean that the Seller has satisfactorily performed. *SELLERS WARRANTY OF STANDARD QUALITY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES. EXPRESS OR IMPLIED. INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE,* SELLER NEITHER ASSUMES NOR AUTHORIZES ANY PERSON TO ASSUME FOR IT ANY OTHER LIABILITY IN CONNECTION WITH THE SALE OR USE OF THE MATERIALS SOLD HEREUNDER, AND THERE ARE NO AGREEMENTS OR WARRANTIES, EITHER ORAL OR WRITTEN, COLLATERAL TO OR AFFECTING THIS AGREEMENT.

In utilizing the METTON® to make plastic parts, Allmand experienced problems. Specifically, the METTON® liquids attacked Allmand's zinc alloy tools, caused unacceptable air bubbles, warpage and pinholes in parts, required secondary finishing, required a cycle time of two to three times longer than represented by Hercules, and demanded excessive cleaning. Hercules representatives consistently attempted to resolve these problems. The difficulties encountered mirrored troubles suffered in 1987–1988 by a prior Hercules' licensee, PPD Hercules ("PPD"), located in Quebec, Canada.

One of the most significant troubles Allmand experienced while molding with METTON® liquid resins was the emission of noxious vapors and odors. These pungent smells annoyed the neighboring community, and in fact, the Wayne County Department of Health issued Allmand nine to ten citations as a result of the emissions. To subdue the odor and contain the vapors, Allmand purchased an Airex thermal oxidizer unit ("RETOX 2000") from Hercules pursuant to a third LMR Sales Equipment Agreement on February 13, 1992. Significant labor had to be undertaken by Allmand, including building a new room at Allmand's facility, to install the unit.

In 1992, after receiving numerous customer complaints and losing the business of Polaris, Bombadier, Mark III and Blue Bird, Allmand commenced negotiations with Hercules' competitor, B.F. Goodrich. In 1993, it decided to switch to Goodrich's product, TELENE and sever its ties with Hercules. On September 23, 1993, Allmand sent Hercules a letter indicating that it was terminating the GML Agreement.

Four days after sending the letter, Allmand filed a complaint against Hercules in the United States District Court for the Eastern District of Michigan. The case was assigned to this court. The complaint alleges four counts: breach of express warranty (Count I); fraud and misrepresentation (Count II); breach of contract (Count III) and breach of implied warranty of fitness for the use intended (Count IV). Hercules filed a countercomplaint on November 8, 1993 alleging five counts: breach of GML Agreement (Count I); breach of Codevelopment Agreement (Count II); breach of January 24 and July 31, 1991 LMR Equipment Sales Agreements (Count III); breach of contract to purchase METTON® (Count IV); and interest as damages (Count V).

On November 8, 1993, Hercules filed a separate lawsuit in the United States District Court for the Eastern District of Michigan against Allmand alleging breach of the February 13, 1992 LMR Equipment Sales Agreement ("RETOX 2000 claim"). The lawsuit was assigned to the Honorable Robert E. DeMascio, who subsequently transferred the case to this court for consolidation with the case filed by Allmand on September 27, 1993.

Presently before this court are three summary judgment motions filed by Hercules: (1) motion for summary judgment on all four counts of Allmand's complaint; (2) motion for partial summary judgment on Counts I, III and IV of Hercules' countercomplaint, and; (3) motion for summary judgment on Hercules' RETOX 2000 claim. Each motion will be discussed *seriatim.*

## ANALYSIS

### I. HERCULES MOTION FOR SUMMARY JUDGMENT AS TO ALLMAND'S COMPLAINT

The first motion this court will discuss is Hercules' motion for summary judgment as to Allmand's complaint. Once again, Allmand's complaint contains the following four counts: breach of express warranty, fraud and misrepresentation, breach of contract and breach of implied warranty of fitness for the use intended.

### A. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510. In deciding a motion for summary judgment, the court must consider all evidence together with all inferences to be drawn therefrom "in light most favorable to the party opposing the motion." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.*, 630 F.2d 1155, 1158 (6th Cir.1980).

If the movant meets the standard specified at Rule 56(c), then the opposing party must come forth with "specific facts showing that there is a genuine issue for trial." *First National Bank v. Cities Serv. Co.*, 391 U.S. 253, 270, 88 S.Ct. 1575, 1583, 20 L.Ed.2d 569 (1968); Fed.R.Civ.P. 56(e). The non-moving party "is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). And, "if the adverse party does not respond, summary judgment, if appropriate shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976); *O'Hara v. Wigginton*, 24 F.3d 823, 826–27 (6th Cir. 1994).

### B. Count II—Fraud and Misrepresentation

▉▉▉ Count II of Allmand's complaint contains a claim for fraud and misrepresentation.[3] Specifically, Count II maintains that in the latter part of 1989 and early 1990, Hercules made various oral and written representations to Allmand regarding qualities of METTON® which induced Allmand to enter into "the contract[4] and relationship" with Hercules. Hercules contends that this claim is barred by the "economic loss doctrine." This doctrine precludes plaintiff from bringing an action in tort where damages

---

3. In diversity cases, the trial court must look to the choice of law rules of the state in which the federal court sits. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Michigan law, tort claims are determined according to the law of the forum, unless there is a "rational reason" to displace the forum's law. *Olmstead v. Anderson*, 428 Mich. 1, 29–30, 400 N.W.2d 292 (1987). As the effects of the alleged tort were felt in Michigan, and the parties agree that Michigan law applies, there is no "rational reason" to look to any other law. Hence, this court will apply Michigan law to Count II.

4. Allmand does not indicate what "contract" (e.g. GML Agreement, Codevelopment Agreement, etc.) to which it is referring.

arise out of the commercial sale of goods and the losses incurred are purely economic. *Neibarger v. Universal Cooperatives,* 439 Mich. 512, 528, 486 N.W.2d 612 (1992); *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 368, 532 N.W.2d 541 (1995).

### 1. Whether the Predominant Purpose of the Parties' Dealings Was For the Sale of Goods

■ Michigan courts apply the economic loss doctrine exclusively in cases involving the sale of goods,[5] where the Uniform Commercial Code ("U.C.C.") is implicated. *See* M.C.L. § 440.2102 (U.C.C. applies exclusively to transactions involving goods). The doctrine does not apply to cases involving transactions for services. See *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.,* 71 F.3d 545, 550 (6th Cir.1995) ("Michigan courts apply the doctrine only in situations involving the sale of goods.").[6] Here, the parties' relationship undeniably involved an amalgamation of *both* goods and services.

■ When faced with a mixed goods-services situation, Michigan courts employ a "predominant factor" test and assess the overall impetus of the parties' dealings. *McFadden v. Imus,* 192 Mich.App. 629, 632, 481 N.W.2d 812 (1992). If the parties thrust, their purpose, reasonably stated, is the rendition of goods, with services incidentally involved then the U.C.C. is applicable and the economic loss doctrine comes into play. *Neibarger,* 439 Mich. at 534, 486 N.W.2d 612 (adopting the predominant purpose test used by the Eighth Circuit in *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974)). On the other hand, if the parties entered a service transaction with goods incidentally involved, then the U.C.C. and the economic loss doctrine have no application. Essentially, what the court is searching for is whether the sale of goods or sale of services is the *raison d'etre* of the agreements upon which the tort

claim is based. *WICO Corp. v. Willis Industries,* 567 F.Supp. 352 (N.D.Ill.1983) (court found *raison d'etre* of contract was sale of graphics, even though the contract contained service aspects aimed at developing and increasing market for buyer's products). Factors relevant to the predominant purpose inquiry include language of the parties' agreements, the circumstances surrounding their execution, *Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F.2d 456 (4th Cir.1983), *aff'd* 778 F.2d 196 (1985), *cert. denied* 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986), and the allocation between costs of materials and services and the relative cost of goods to the total contract prices, *Aluminum Company of America v. Electro Flo Corporation,* 451 F.2d 1115, 1118 (10th Cir.1971).

■ The question of whether goods or services predominate in a hybrid contract is one of fact, *Higgins v. Lauritzen,* 209 Mich. App. 266, 269, 530 N.W.2d 171 (1995) and therefore, a jury question. *Downriver Internists v. Harris Corp.,* 929 F.2d 1147 (6th Cir.1991). "However, when there is no genuine issue of material fact in dispute regarding the provisions of the contract, a court may decide the issue as a matter of law." *Higgins,* 209 Mich.App. at 270, 530 N.W.2d 171. The Court should be mindful of the principle that the "scope of coverage of 'goods' is not to be given a narrow construction but instead should be viewed as being broad in scope so as to carry out the underlying purpose of the Code of achieving uniformity in commercial transactions." *Coca–Cola Bottling Company of Elizabethtown, Inc. et al. v. The Coca–Cola Company,* 696 F.Supp. 57, 85 (D.Del.1988).

■ Viewing all the evidence in a light most favorable to Allmand, this court is convinced that the main thrust of the relationship between Hercules and Allmand upon which Allmand bases its fraud claim was the

---

**5.** "Goods" are defined as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than money in which the price is to be paid, investment securities (Article 8) and things in action." M.C.L. 440.2105.

**6.** In the case of *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich. App. 365, 532 N.W.2d 541 (1995), the Michigan Court of Appeals found the economic loss doctrine to be a creature of common law, and insinuated that the doctrine is not limited to the U.C.C.. *Id.* at 374, 532 N.W.2d 541.

purchase and sale of a good—METTON® liquid molding resin. For one, the circumstances surrounding the founding of the parties' relationship and language of the initial agreements executed by the parties leads this court to such a conclusion. The Codevelopment Agreement expressly reveals that Allmand commenced negotiations with Hercules because it was "interested in evaluating new *materials* for use in molded, shaped articles." To that end, the Codevelopment Agreement provided that Allmand was *to* make prototypes with free samples of liquid METTON® supplied by Hercules in order to determine the feasibility of using MET-TON® in its manufacturing process. The GML Agreement also shows that the parties dealings centered around a good. Under the GML Agreement, Allmand promised to purchase its entire supply of liquid molding resin from Hercules. For the three year period following the effectuation of this contract, Allmand procured and utilized a tremendous amount of Hercules' product, upward of 8,000 pounds per day. *Bailey Farms, Inc. v. NOR–AM Chemical Co.*, 27 F.3d 188 (6th Cir.1994) (economic loss doctrine barred farmer's claim of negligent misrepresentation against manufacturer who misinformed farmer of proper use of fumigant that destroyed crops); *Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174, 181–82 (7th Cir.1986) (agreement was for the sale of goods even though accompanying design and engineering services were substantial) (*citing Yorke v. B.F. Goodrich Co.*, 130 Ill.App.3d 220, 85 Ill.Dec. 606, 474 N.E.2d 20 (2d Dist. 1985) ("transaction involving sale of vinyl pellets for the production of vinyl siding was contract for sale of goods despite seller's agreement to provide technical assistance")); *Matter of L.B. Trucking, Inc.*, 163 B.R. 709 (D.Del.1994) (U.C.C. applied to sale of herbicides where buyer needed trained herbicide applicator to spray fields as buyer lacked technical knowledge); *Industrial Specialty Chemicals, Inc. v. Cummins Engine Co., Inc.*, 902 F.Supp. 805 (N.D.Ill.1995) (requirements contract for chemicals specially developed to meet buyer's criteria was sale of goods even though seller had expended thousands of hours in adapting product to meet buyer's specifications); *Montana Millwork,*

*Inc. v. Caradco Corp.*, 648 F.Supp. 88 (D.Mont.1986) (contract for sale of lumber on a monthly basis was a good even though sale included seller's technical assistance in ripping, cutting and finger jointing)

In deciding that the relationship was one for "goods," this court is not blind to all the services involved in this case. Yet, any reasonable juror would conclude that the services involved were merely incidental to the sale of the METTON®. For one, under the GML Agreement, Hercules was to provide skilled personnel and technical assistance to Allmand. The following plain and unambiguous language of the GML Agreement, however, shows that such services were merely incidental to the sale of the METTON® liquid molding resin. The GML Agreement provides:

> *6.1* Normal technical assistance *of the type usually associated with the sale of polymer products* shall be rendered to LICENSEE [Allmand] throughout the term of this Agreement. In addition, LICENSEE [Allmand] shall have the right to have its representatives visit the HERCULES Technical Service facilities as reasonably required throughout the term of this Agreement.
>
> *6.2 Upon request* from LICENSEE [Allmand], HERCULES shall provide the services of personnel skilled in the polymerization of Reactant Liquids and molding of Polymer to assist LICENSEE during the design, procurement and start-up of a facility for manufacturing Molded Articles according to this Agreement and for training of LICENSEE's personnel. These services shall be provided free of charge and HERCULES shall pay and bear necessary expenses for these services, including, but not limited to, travel and living expenses of HERCULES employees.

(emphasis added).

Hercules also provided marketing services, including accompanying Allmand on customer calls. As Garland Lee, Marketing Manager for Hercules, explained at his deposition, Hercules wanted to help Allmand diversify its business base. Allmand would like this court to believe that the parties' relationship centered around this marketing service, but

the overwhelming evidence is that Hercules' provided such a service only to sell more of its product—METTON® liquid molding resins. Hercules is engaged in the sale of resin, a good; it is not a marketing consulting service. In fact, Allmand did not pay for any of Hercules' marketing services, which bolsters this court's conclusion that the predominant purpose of the relationship was the sale of a good.

Allmand insists that it *did* pay Hercules' for services in the form of royalties due under the GML Agreement. Yet, absolutely no evidence has been adduced by Allmand to support this assertion. Indeed, all the evidence in the record is to the contrary. For instance, the GML Agreement requires Allmand to pay a $50,000.00 initial royalty fee, in addition to a fee of seven and a half cents per pound of resin purchased by Allmand for use of Hercules' patents. These amounts were due regardless of whether Hercules provided services to Allmand, for nowhere in the GML Agreement does it state that Allmand promises to pay these royalty fees only after Hercules provides services. In fact, the GML Agreement enabled Allmand to earn credits against its $50,000 obligation for the expenses Allmand incurred in carrying out the Codevelopment Agreement, i.e. making a prototype using METTON® liquid molding resins.

Allmand also argues that a Meeting Log prepared by Nicholas Bogdanos, Vice–President and General Manager of Allmand, showing that Allmand and Hercules' representatives met many times throughout January of 1989 through June of 1993 to discuss MET-TON® and marketing services, speaks for itself, and proves that the U.C.C. does not govern. Quite frankly, this court is at a loss why a Meeting Log establishing that the parties held numerous conferences about METTON® liquid molding resins and marketing proves that the predominant purpose of the parties' relationship was services. It appears to this court from a review of the Meeting Log that all these meetings were incidental to the sale of liquid molding resin. Without further explanation, this court can arrive at no other conclusion. *WICO Corporation v. Willis Industries,* 567 F.Supp. 352, 355 (N.D.Ill.1983) (finding a contract to be for the sale of goods since the service aspects of the agreement were aimed at developing and increasing the market for the sale of goods) Cf. *Aluminum Co. of America v. Electro Flo Corp.,* 451 F.2d 1115, 1118 (10th Cir.1971) (finding the transaction between the parties "while it involved some engineering and design aspects, [to be] in essence a sale of goods").

The cases cited by Allmand in support of its position that services predominated, or at the very least there is a question of fact whether services predominated, are distinguishable. Allmand cites *Coca–Cola Bottling of Elizabethtown v. Coca–Cola Co.,* 696 F.Supp. 57 (D.Del.1988), in which the court found a mixed goods-services contract to be outside the scope of the U.C.C. In that case, the Coca–Cola bottlers ("bottlers") sued the Coca–Cola Company ("Company") for, *inter alia,* damages resulting from being overcharged for Coca–Cola syrup. A question arose as to whether the relationship between the parties was predominantly one for services, or goods. The court found that neither the goods nor the services predominated, and thus refused to apply the U.C.C. The court reasoned that the relationship between the parties was an "ancient" and "perpetual" one, where the Company did more than just sell bottlers syrup. Indeed, the Company transferred "the business of bottling" to the bottlers. *Id.* at 85. There were covenants between the parties "making obligatory on the part of the purchaser [bottlers] the establishment of bottling plants having capacity sufficient to supply the greater part of the nation and restricting the sale of syrup, except after it is carbonated and bottled.'" *Id.* at 84. Trademark rights were co-owned by the bottlers and the Company and the bottlers had the *exclusive* right to use the vendor's trademark. *Id.* at 84, 85. In addition, advertising was shared. *Id.* at 85. The relationship between the two parties was unique and the court found the service orientation of the contracts much more than collateral to the sale of goods. *Id.* at 85.

Unlike *Coca–Cola,* the companies involved in the instant dispute were separate existing entities at the time they entered negotiations

and could terminate their relationship at any time with proper notice. Contrary to the situation of the company in *Coca–Cola* which was relying on the bottlers to distribute its product to the nation, Allmand was not engaged in the nationwide sale of METTON®. METTON® was a material Allmand purchased for use in manufacturing its molded parts. In fact, Allmand did not own or have an exclusive right to use Hercules' trademark,[7] whereas the bottlers both owned and had such a privilege. Indeed, the only similarity between *Coca–Cola* and the instant case is that in both cases there was shared marketing. Nevertheless, the degree of joint marketing ventured into by Allmand and Hercules does not even approach the level involved in *Coca–Cola*, and this factor therefore does not convince the court that cases are similar. In sum, when the cases are compared, it becomes clear that the *Coca–Cola* case is not analogous to the instant case.

*Home Insurance Co. v. Detroit Fire Extinguisher Co., Inc.*, 212 Mich.App. 522, 538 N.W.2d 424 (1995), *lv. app. denied*, 451 Mich. 915, 550 N.W.2d 526 (1996), another case cited by Allmand, is also distinguishable. In *Home Insurance*, the defendant contracted to design, install and then regularly service a fire extinguishing system in a manufacturing plant. Included in the contract price were "all necessary pipe[s], fittings, nozzles, system equipment, drawings, engineering and labor to install" the system. *Id.* at 524, 538 N.W.2d 424. The lower court found the contract to be for the sale of a fire extinguisher, a good, and thus, governed by the U.C.C. The Court of Appeals reversed, finding a genuine issue of material fact as to whether goods or services predominated. Specifically, the higher court found that the contract may have been predominantly for services because it called for ongoing services related to a unique system, including design and installation followed by regular maintenance and testing. There was a question of fact as to whether the goods used to assemble the system, i.e. nozzle, pipe, etc., were collateral

to the services. The Court of Appeals contrasted the case before it with a case involving a "contract call[ing] for the purchase of a pre-existing product, with the only service being its installation." In that case, the lower court's conclusion that the contract was one for goods "undeniably would have been sustainable." *Id.* at 528, 538 N.W.2d 424.

The instant case is similar to the hypothetical posed in *Home Insurance*. Hercules sold Allmand an exorbitant amount of a pre-existing product—METTON® liquid molding resin—for nearly three years. In fact, Hercules used up to as much as 8000 pounds of METTON® per day. Bogdanos testified that at times Allmand ordered and used 1539 METTON® and other times it used 1536 METTON®.

The case of *Rajala v. Allied Corporation*, 66 B.R. 582 (D.Kan.1986) is strikingly similar to the case at hand, and provides particular guidance to this court in resolving this thorny issue. In *Rajala*, Allied, a company which was in the process of developing a high density polyethylene resin (HDPE), contracted with General Poly, a company engaged in "extrusion," which is the process of converting resin into various plastic products, including film and bags. Under the contract, General Poly would provide extrusion technology and assistance to Allied so that Allied could produce a quality resin and Allied, in exchange, would provide a high quality resin to General Poly. After encountering numerous problems with the resin, General Poly eventually went bankrupt and filed a lawsuit against Allied, asserting among other claims, a claim of breach of contract. Allied moved for summary judgment on General Poly's breach of contract claim, and a threshold issue was whether the contract was governed by the U.C.C. or common law or both.

The court found that the contract contained a "good" and "service" portion, so applied the predominant purpose test to determine which portion constituted the "essence" of the contract. *Id.* at 590. Ultimately, the court concluded that the thrust of the

---

**7.** Article 11 of the GML Agreement gave Allmand the right to use Hercules' trademark METTON® to identify the source of liquid molding resin used to make molded articles. The GML Agree-

ment made clear that Allmand's use of the trademark was to "enure to the benefit of Hercules." At no time, was Allmand to claim any ownership of it.

agreement "was the sale and purchase of resin" and that the U.C.C. governed. *Id.*

[I]n order to make th[e] sale [of resin] possible, a suitable resin had to be developed. The development portion of the contract was only incidental to the dominant goal of the sale and purchase of the resin. General Poly was only to pay for the final product, not for the development efforts.

*Id. See also Aluminum Company of America v. Electro Flo Corp.,* 451 F.2d 1115, 1118 (10th Cir.1971) (finding the transaction between the parties, "while it involved some engineering and design aspects, [to be] in essence a sale of goods"); *WICO Corporation v. Willis Industries,* 567 F.Supp. 352, 355 (N.D.Ill.1983) (finding a contract to be for the sale of goods since the service aspects of the agreement were aimed at developing and increasing the market for the goods). Similar to *Rajala,* the technical, marketing and developmental services provided by Hercules were incidental to providing Allmand with a suitable resin.

For all the foregoing reasons, this court finds that the U.C.C. governs.

### 2. Whether the Economic Loss Doctrine Bars Plaintiff's Claims

■ Having found the U.C.C. applicable, the next issue confronting this court is whether the economic loss doctrine bars Allmand's claims. In a nutshell, the economic loss doctrine bars tort recovery for economic losses "caused by a defective product purchased for commercial purposes," thereby making the exclusive remedy the U.C.C.. *Neibarger v. Universal Cooperatives,* 439 Mich. 512, 528, 486 N.W.2d 612 (1992). *See also Huron Tool v. Precision Consult.,* 209 Mich.App. 365, 368, 532 N.W.2d 541 (1995) (*citing Kennedy v. Columbia Lumber and Manufacturing Co.,* 299 S.C. 335, 345, 384 S.E.2d 730 (1989)).

"Determining when the economic loss doctrine applies requires 'consideration of the underlying policies of tort and contract law

as well as the nature of damages.'" *Frankenmuth Mut. Ins. Co. v. Ace Hardware Corp.,* 899 F.Supp. 348, 351 (W.D.Mich.1995). The principal rationale behind this doctrine is that "tort law is a superfluous and inapt tool for resolving purely commercial disputes" and therefore contract law should be the exclusive source of law governing commercial controversies. In the commercial realm, parties have the ability to bargain for the terms of the sale, and will be able to allocate the risks and costs of a product's potential performance. *Miller v. United States Steel Corp.,* 902 F.2d 573 (7th Cir.1990). *See also Neibarger,* 439 Mich. at 532, 486 N.W.2d 612 (observing that the economic loss doctrine is premised upon the belief that commercial parties have equivalent bargaining power, and therefore, the damages within the contemplation of the parties to the agreement could have been the subject of negotiations).

■ In the case *sub judice,* Allmand's losses are quintessential economic losses.[8] At the heart of Allmand's fraud claim is the fact that Allmand purchased products which proved inadequate for their purposes, causing it lost profits of the type compensable in a suit under the U.C.C. *Neibarger,* 439 Mich. at 537, 486 N.W.2d 612. The damages merely reflect a concern about the quality expected by the buyer, Allmand, and promised by the seller, Hercules, which is in essence, a warranty action. *Id.* at 531, 486 N.W.2d 612. The decision to purchase the liquid molding resin was entirely a business decision. Allmand and Hercules entered transactions for the METTON® on equal footing, conducted extensive negotiations and ultimately executed a number of written contracts. The companies could have negotiated the terms of the sale and allocated the risks associated with defective goods. This action clearly falls within the ambit of the economic loss doctrine, unless an exception applies.

■ The Michigan courts have carved out one exception to the economic loss doctrine, to wit: fraud in the inducement. The Michi-

---

**8.** Note that even if the U.C.C. is not applicable to all contracts (e.g. GML Agreement), it is most certainly applicable to the contract or relationship on which Allmand's fraud claim is prem-

ised. This is because Allmand's fraud and misrepresentation cause of action arises specifically out of the contract for the purchase and sale of METTON®.

gan Court of Appeals has defined what constitutes a "fraud in the inducement" claim:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely-which normally would constitute grounds for invoking the economic loss doctrine-but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the *only misrepresentation by the dishonest party concerns the quality or character of the goods sold*, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

*Huron Tool*, 209 Mich.App. at 372–73, 532 N.W.2d 541 (emphasis added).

In *Huron Tool*, the court found that plaintiff's fraud claim was not a "fraud in the inducement" cause of action, and thus did not fall outside the ambit of the economic loss doctrine. The court reasoned that "[t]he fraudulent representations alleged by plaintiff concern[ed] the quality and characteristics of the software system sold by defendants," and that the representations were "indistinguishable from the terms of the contract and warranty that plaintiff allege[d] were breached." *Id.* "Because plaintiff's allegations of fraud [were] not extraneous to the contractual dispute, plaintiff [was] restricted to its contractual remedies under the U.C.C." *Id.*

Similar to *Huron Tool*, in the instant case, Allmand's fraud claim fails to allege any wrongdoing by Hercules independent of its breach of contract and warranty. Specifically, all of the alleged misrepresentations by Hercules concerned the quality and charac-

teristics of METTON®. For example, Allmand claims that Hercules represented that METTON® would be compatible with zinc alloy tooling, which was allegedly false since METTON® ruined Allmand's tools. Allmand also claims, for instance, that Hercules' representatives misrepresented the cycle time for forming a mold out of METTON®. Due to the fact that Allmand's allegations of fraud are not extraneous to the contractual dispute, they do not give rise to an independent action in tort. Allmand's fraud claim is barred by the economic loss doctrine and summary judgment must be entered in favor of Hercules on this claim. *Huron Tool*, 209 Mich.App. at 375, 532 N.W.2d 541 (holding that plaintiff's claims of fraud related only to the quality and characteristics of the software system and thus were barred by the economic loss doctrine) Allmand must look to the law of contracts, and specifically the U.C.C.'s warranty provision for redress.

### C. Count I—Breach of Express Warranty

 Count I of Allmand's complaint alleges that Hercules made specific express warranties, both orally and in writing, that METTON® liquid molding resin would produce high-quality molded parts under low pressure in a cost-effective manner. Allmand claims that all these express warranties were breached and seeks consequential damages, i.e. lost profits, cost of tooling repairs, reworking and scrapping material, tooling cost overruns, loss of future business, and loss of standing and reputation in the community.[9] Such a claim, which essentially alleges that METTON® (a good) did not perform as warranted, is governed by the U.C.C.[10]

---

9. Michigan law governs this claim, as well as Count IV (breach of implied warranty of fitness for a particular purpose). In the absence of a choice of law provision, the Michigan U.C.C. applies to transactions bearing an appropriate relation to the state. Mich. Comp. Laws § 440.1105. As the contracts were to be performed in Michigan, they undoubtedly bear a reasonable relation to this state. *See also Vanderveen's Importing Co. v. Keramische Industrie M. deWit*, 199 Mich.App. 359, 364, 500 N.W.2d 779 (1993) (citations omitted) ("As a general rule, the validity and construction of a contract is controlled and is to be determined by the law of the situs, the place were the contract was entered

into. A contract executed in one state or jurisdiction but intended to be performed in another state or jurisdiction is governed by the law of the place of performance.").

10. Under Section 2–313 of the U.C.C., Mich. Comp. Laws § 440.2313, an express warranty can be created in a variety of ways, including "an affirmation of fact or promise made by the seller which relates to the goods and becomes part of the basis of the bargain", or "a sample or model which is made part of the basis of the bargain," or "a description of the goods which is made part of the basis of the bargain."

Hercules insists that all the oral and written representations constituting the basis of Allmand's breach of express warranty cause of action are barred by the parol evidence rule. According to Hercules, the parties' final agreement for the sale of METTON® is an Order/Acknowledgment Form, and this Form disclaimed all express warranties given prior to it. In lieu of the antecedent express warranties, Hercules provided Allmand with a warranty of standard quality, which Allmand does *not* allege has been breached.

In order to understand Hercules' argument, a description of the ordering process is necessary. When in need of more MET-TON®, Allmand would transmit an order to Hercules. Then, Hercules would generate and send an Order/Acknowledgment Form to Allmand. The front side of the Order/Acknowledgment Form states in bold print as follows:

The acknowledgment of your order is expressly made conditional on your assent to the terms and conditions stated above and on the reverse side hereof, and we agree to furnish the materials upon these terms and conditions only.

Yours very truly,

Hercules Incorporated

Then, the reverse side of the Order/Acknowledgment Form sets out the various terms and conditions upon which Hercules made Allmand's acceptance conditional. Relevant to the instant motion is paragraph 4 which reads as follows:

4. Seller warrants that the materials sold hereunder shall be of Seller's standard quality, but Buyer assumes all risk and liability whatsoever resulting from the possession, use or disposition of such materials, whether used singly or in combination with other substances. Liability of Seller to Buyer, if any hereunder, for breach of contract, negligence, or otherwise, shall in no event exceed in amount the purchase price of the materials sold with respect to which any damages are claimed. Within thirty (30) days after any shipment reaches its destination (but in no event later than ninety (90) days after shipment leaves Seller's plant) the materials shall be examined and tested, and promptly thereafter and before the materials are used, Seller's shall be notified in writing or by cable in case the materials are found defective or short in any respect. Failure to so notify the Seller shall constitute a waiver of all claims with respect to the materials, and in any event the use of the materials shall be deemed to mean that the Seller has satisfactorily performed. *SELLER'S WARRANTY OF STANDARD DUALITY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED. INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.* SELLER NEITHER ASSUMES NOR AUTHORIZES ANY PERSON TO ASSUME FOR IT ANY OTHER LIABILITY IN CONNECTION WITH THE SALE OR USE OF THE MATERIALS SOLD HEREUNDER, AND THERE ARE NO AGREEMENTS OR WARRANTIES, EITHER ORAL OR WRITTEN, COLLATERAL TO OR AFFECTING THIS AGREEMENT.

Section 2–202 of the U.C.C., Mich.Comp. Laws § 440.2202, makes clear that evidence of warranties or representations which were given prior to the date of an agreement for the sale of a good are barred if the contract was intended as the final expression of the parties' agreement. Section 2–202 reads as follows:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented.

(a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Mich.Comp. Laws § 440.2202. In this case, then, if the Order/Acknowledgment Form was intended as the final expression of the parties' agreement, then any warranties provided prior to its execution are parol evidence and barred under Section 2–202 of the U.C.C.

■■■■■ Whether the Order/Acknowledgment Form was intended to be the final agreement is a question of fact. *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758 (10th Cir.1983) (whether the parties intended an invoice to constitute the final agreement is a question of fact). Hercules argues that there is no genuine issue of material fact that the Order/Acknowledgment Form was the complete and exclusive contract for the purchase and sale of METTON® liquid molding resin. According to Hercules, a carefully drafted merger clause in the Form conspicuously provided that "there are no agreements or warranties, either oral or written, collateral to or affecting this agreement." *See* J.J. White & R.S. Summers, *Uniform Commercial Code* (3d ed.), § 12.4 ("If a [merger] clause conspicuously appears in the agreement, a court will have some difficulty in giving effect to oral warranties that the buyer says the seller gave before the written agreement was signed.").

Allmand has not come forward with any evidence contradicting Hercules' assertion that the Order/Acknowledgment Form was the final and entire agreement. In fact, Allmand has not even responded to Hercules' argument concerning the applicability of the U.C.C.'s parol evidence rule (Section 2–202), except for stating that U.C.C. does not apply to any its Allmand's claims.[11] Because this court has found the U.C.C. controlling here, Allmand's argument is futile. Since there is no genuine issue of material fact that the Order/Acknowledgment Form is the final agreement, all oral representations and express warranties made preceding the Order/Acknowledgment Form are barred by the parol evidence rule. The only express warranty provided to Allmand was an express warranty of standard quality. Allmand does not alleges that this has been breached. Accordingly, Hercules' motion for summary judgment on Allmand's breach of express warranty claim, which relies exclusively on representations made prior to the Order/Acknowledgment Form, must be granted.[12]

### D. Count IV—Breach of Implied Warranty of Fitness for a Particular Purpose

Allmand alleges at Count IV of its complaint that Hercules breached an implied warranty of fitness for the use intended (a.k.a. an implied warranty of fitness for a particular purpose) Allmand asserts that Hercules contracted to provide Allmand a material that could be utilized under low pressure and that would allow Allmand's zinc alloy tools to make high volume quality parts. According to Allmand, the METTON® was not fit for Allmand's intended use because it pitted tools, created environmentally deficient fumes and odors, and produced low volume damaged parts.

The claim of implied warranty of fitness for a particular purpose is a statutorily created remedy provided for under Section 2–315 of the U.C.C. Section 2–315 of the U.C.C., M.C.L. § 440.2315 describes the warranty in the following way:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified

---

11. This could not be true. Count IV of Allmand's complaint contains a claim for breach of implied warranty of fitness for a particular purpose. The U.C.C. must apply to this claim since this claim is not recognized by common law, but is a statutory remedy under the U.C.C.. *DeValerio v. Vic Tanny, Int'l*, 140 Mich.App. 176, 180, 363 N.W.2d 447 (1984) ("Warranties of ... fitness for a particular purpose are, by their very nature, inapposite to a contract for services."), *lv. app. denied*, 423 Mich. 858 (1985).

12. Hercules makes an alternative argument that if Allmand's express warranty claim is found viable, then Allmand's damages are limited to the purchase price of the materials sold. This court need not address the issue of whether Allmand's damages are so limited since this court has found that Allmand's express warranty claim must be dismissed.

under the next section an implied warranty that the goods shall be fit for such purpose.

Section 2–607 of the U.C.C. imposes a notice requirement on the buyer after a good has been tendered and accepted. Specifically, this section requires that "the buyer must within a reasonable time after he discovers or should have discovered any breach [of implied warranty of fitness for a particular purpose] notify the seller of breach or be barred from any remedy." M.C.L. § 440.2607. Comment 4 to section 2–607 discusses the extent of detail required in the notification:

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection. (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

The Sixth Circuit has clarified the meaning of Comment 4. In *K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106 (6th Cir. 1982), the Sixth Circuit held that it is not merely enough for the buyer to notify the seller that it is having difficulty with the goods. *Id.* at 1112–14. Rather, the seller must be notified that the "buyer considered him to be in breach." *Id.* at 1113 (citation omitted).

In it's first attack on Count IV, Hercules insists that Allmand did not give sufficient notice of the breach of implied warranty of fitness for a particular purpose, as required by Section 2–607. Hercules maintains that Allmand did not specifically mention pursuing litigation and did not speak of any

"breach of implied warranty of fitness for a particular purpose" prior to filing this lawsuit. According to Hercules, Allmand did not notify it of its intent to claim breach of warranty so that Allmand could continue to use METTON® up until the time it could easily make the transition to the competitor's product, TELENE. And, Hercules claims that it would not have subordinated its security interest in various machinery sold to Allmand had Allmand notified it that it considered Hercules to be in breach.

In reply, Allmand asserts that such an argument "is absurd" because Allmand did all that was required of it. Allmand states that it repeatedly complained to Hercules regarding the problems it was having with METTON®, which should constitute sufficient notice.

This court finds a genuine issue of material fact as to whether Allmand provided sufficient notice of the breach of this warranty. While it is undisputed that Allmand, on various occasions, notified Hercules that it was having difficulties with METTON® liquid molding resins, it is not clear whether Allmand notified Hercules that it considered it to be in breach. The evidence submitted by Hercules does not show that Allmand never told Hercules it considered them to be in breach, it merely shows that Hercules was not aware of any lawsuit for breach of contract. This issue needs further factual development in order for the court to decide the issue. *See also Boeing Airplane Co. v. O'Malley*, 329 F.2d 585 (8th Cir.1964) (holding that certain events were sufficient to constitute notice of breach of implied warranty including the buyer informing the seller that it was closing down operations due to inadequacies in the helicopter).

■■■ Hercules next argues that even if Allmand gave Hercules sufficient notice, Allmand's claim must fail. Hercules asserts that it validly disclaimed the implied warranty of fitness for a particular purpose in the Order/Acknowledgment Form. In order to validly renounce an implied warranty of fitness for a particular purpose in a final con-

tract for the sale of a good,[13] Section 2–316(2) requires two things: (1) that the disclaimer be "conspicuous" and (2) that it be in writing. The disclaimer in the instant case was in writing. Thus, the second element was satisfied. Moreover, there is no question that the disclaimer was "conspicuous." A clause is "conspicuous" when "it is so written that a reasonable person against whom it is to operate ought to have noticed it." Mich.Comp. Laws § 440.1201(10). Here, the disclaimer was in all capital letters and the U.C.C. declares that "[a] printed heading in capitals" is conspicuous. *Id.* Accordingly, since the two elements necessary to disclaim the implied warranty of fitness for a particular purpose were met, this court finds that Hercules validly disclaimed such a warranty. Allmand has not even addressed Hercules' argument regarding.whether there has been a valid disclaimer of the implied warranty. All it argues is that the U.C.C. does not govern here. This argument is devoid of any merit, however, since the implied warranty of fitness for a particular purpose is solely a U.C.C. remedy. Therefore the U.C.C. must govern Count IV. *DeValerio v. Vic Tanny, Int'l,* 140 Mich.App. at 180, 363 N.W.2d 447. Since this court finds that Hercules validly disclaimed the implied warranty of fitness for a particular purpose, Hercules is entitled to summary judgment on Count IV of Allmand's complaint.

Hercules makes other arguments as to why the implied warranty claim fails, such as waiver. In light of the finding that there has been a valid disclaimer of the implied warranty of fitness for a particular purpose, this court need not address whether Allmand waived its right to bring such a claim.

**13.** As a preliminary matter, it is worthy to note that this court has already concluded that this Form constitutes the parties' final and complete agreement regarding the sale of METTON® liquid molding resin.

**14.** Delaware law governs claims relating to the GML Agreement, including Count III. Paragraph 15.1 of the General Molder License Agreement provides, "This Agreement shall be interpreted and governed by the laws of Delaware." "Michigan law permits parties to choose for themselves which state's law will govern their contract." *Liberty Mutual Ins. Co. v. Vanderbush Sheet Metal*

### E. Count III—Breach of Contract

At Count III of its complaint, Allmand alleges breach of contract. In particular, Allmand claims that Hercules did not impart "skill" for the making of a closed mold into a desired shape. Count III also alleges that Hercules did not share the "know-how," "technology," "operating experience," "information," and "skilled personnel" necessary to manufacture quality molded parts.

As a threshold issue, this court must construe the scope of Count III. Hercules argues that it only contains a claim for breach of the GML Agreement, while Allmand insists that it contains a claim for breach of both the GML and Codevelopment Agreements. Construing the complaint in a way so as to do substantial justice, this court finds that Count III only contains a claim for breach of GML Agreement. Fed.R.Civ.P. 8. The only contract expressly and impliedly mentioned at Count III is the GML Agreement. Moreover, two contractual provisions from the GML Agreement are cited at Count III, but absolutely no provisions of the Codevelopment Agreement are referenced either explicitly of implicitly. Under the most generous of readings, Count III only notifies Hercules of a claim of breach of the GML Agreement.

Having determined that Count III contains a claim for breach of the GML Agreement, only, the next issue is whether Hercules is entitled to summary judgment on such claim. For the following reasons, this court holds that it is.

At Count III, Allmand alleges that Hercules did not fulfill two provisions of the GML Agreement, to wit: Articles 5 and [14] Article 5 reads as follows:

*Co.,* 512 F.Supp. 1159, 1169 (E.D.Mich.1981). *See also* Restatement (Second) of conflict of Law § 187(2)(a) (providing that the law chosen by the parties will govern their contractual dispute unless either "the chosen state has no substantial relationship to the parties or the transaction or there is no other reasonable basis for the parties' choice or application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which, under the rule of § 188, would be the state of applicable law in the ab-

*5.1* HERCULES shall-disclose Manufacturing Information according to a time schedule and manner to be agreed upon the parties hereto.

*5.2* Disclosure of Manufacturing Information shall include a Technical Manual, demonstrations at HERCULES' Technical Service facilities and discussions with HERCULES personnel.

Manufacturing information is defined in the GML Agreement in the following way:

Hercules know-how, technology, skill and operating experience related to and necessary for the manufacture of Molded Articles using a technique where a first reactant precursor liquid containing dicyclopentadiene and optionally one or more other strained ring cycloolefins, a metathesis catalyst and other functional additives, and a second reactant precursor liquid containing dicyclopentadiene and, optionally, one or more other strained ring cycloolefins, a metathesis catalyst activator and other functional additive are combined and charged into a closed mold wherein a rapid reaction and solidification into the desired shape take place. Specifically excluded from Manufacturing Information is information relating to catalysts and activators and preparation thereof and information relating to the composition, formulation and preparation of the aforesaid first and second reactant precursor liquids.

Article 6 provides as follows:

*6.1* Normal technical assistance of the type usually associated with the sale of polymer products shall be rendered to LICENSEE [Allmand] throughout the term of this Agreement. In addition, LICENSEE [Allmand] shall have the right to have its representatives visit the HERCULES Technical Service facilities as reasonably required throughout the term of this Agreement.

6.2 Upon request from LICENSEE [Allmand], HERCULES shall provide the services of personnel skilled in the polymerization of Reactant Liquids and molding of Polymer to assist LICENSEE during the

design, procurement and start-up of a facility for manufacturing Molded Articles according to this Agreement and for training of LICENSEE's personnel. These services shall be provided free of charge and HERCULES shall pay and bear necessary expenses for these services, including, but not limited to, travel and living expenses of HERCULES employees.

■■■ Hercules argues that there is no genuine issue of material fact that it did all that was required of it under Articles 5 and 6 of the GML Agreement. Hercules points to Paragraph 27 of Allmand's Complaint which states in pertinent part, "Hercules did as required by said agreement [GML Agreement] disclose the Manufacturing Information and have demonstrations and discussions." Hercules also references this court to the deposition testimony of Bogdanos, General Manager at Allmand, who confirmed that Hercules' employees "shared their technology" with Allmand.

In response, Allmand does not contest Hercules' assertion that Hercules' shared all the knowledge it possessed regarding the polymerization of METTON®. Rather, Allmand insists that the information supplied them was not good enough. The molded parts made out of METTON® were of poor quality and Hercules could not remedy the problems.

■■■ This court finds that there is no genuine issue of material fact that would preclude entering summary judgment in favor of Hercules on Count III. Allmand has not come forward with any evidence to refute the showing made by Hercules that it imparted and shared all the manufacturing information and skilled personnel of which it was capable. The plain and unambiguous terms of the GML Agreement only require that of Hercules. *Myers v. Myers,* 408 A.2d 279, 280 (Del.1979). Allmand attempts to impose duties upon Hercules not specified in the contract. Within the four corners of the GML Agreement, Hercules agreed to share the information necessary to manufacture a molded article. This it did, and in fact parts were molded out of METTON® for three

sence of an effective choice of law by the par-　ties.'').

years. Hercules did not promise that the information shared regarding the molding of METTON® would yield "quality" or "desired" or "usable" parts. If there were any statements made by Hercules of the ability of METTON® to mold a quality part, they were made prior to the signing of the contract and are precluded by the parol evidence rule. This is due to the fact that the GML Agreement contains a merger clause, stating that "[t]his document contains the entire agreement between the parties and shall not be altered or amended except by a written amendment duly executed on behalf of each party." Delaware courts recognize the validity of such clauses. *Sterling v. Beneficial Nat'l. Bank, N.A.*, No. 91C–12–005, 1994 WL 315365, 1994 Del.Super LEXIS 252 (April 13, 1994).

## II. SUMMARY JUDGMENT MOTION NUMBER TWO: HERCULES' MOTION FOR SUMMARY JUDGMENT ON COUNTS I, III, AND IV OF HERCULES' COUNTERCOMPLAINT

Hercules moves for partial summary judgment on its countercomplaint, specifically Counts I, III and IV. Each argument will be addressed in turn.

### A. Count I—Breach of the GML Agreement

Hercules moves for summary judgment on Count I of its countercomplaint.[15] Count I alleges that Allmand breached the GML Agreement by failing to give 90 days notice of termination and by using a competitors product during that 90 day period.

Article 12 of the GML Agreement delineates the parties' rights to terminate the contract:

*12.1* Unless earlier terminated under provisions of this Article 12, this Agreement shall terminate with the expiration of the last to expire of the Patent Rights which are in existence as of the date of execution hereof by LICENSEE [April 26, 1995].

*12.2* LICENSEE may terminate this Agreement any time after one (1) year from the date hereof [October 11, 1990] by giving HERCULES written notice to that effect at least ninety (90) days prior to the desired date of termination.

*12.3* HERCULES may terminate this Agreement upon sixty (60) days written notice to LICENSEE if LICENSEE breached this Agreement by:

a) failing to submit any required statements;

b) failing to pay royalty when due;

c) violating any other material term of this Agreement.

If LICENSEE shall correct any such breach during the sixty (60) day notice period, the notice of termination shall be of no effect.

Article 4 makes plain that until termination of the GML Agreement, Allmand is required to purchase METTON® from Hercules. Article 4 reads, in relevant part, as follows:

LICENSEE shall purchase its entire requirement of Reactant Liquids from HERCULES or from an alternative supplier approved by HERCULES.

██ It is undisputed that Allmand sent notice of termination on September 23, 1993, which was received by Hercules on September 28, 1993.[16] It is also uncontroverted that the effective date of termination was ninety days after the letter was received by Hercules, which would have been December 27, 1993. Moreover, it is clear that after send-

---

**15.** This claim is governed by Delaware law pursuant to a choice of law clause in the contract.

**16.** The notice read as follows:

Dear Ed,

We hereby terminate the license agreement between ourselves and Hercules, because of the continual and previous defaults and misrepresentations of Hercules to us.

We have been continually and repeatedly promised by you that all of your representations and promises would be kept and all of the problems would be remedied; however you have never remedies the problems, misrepresentations or injuries cause to us.

We have suffered irreparable and exhaustive damages as a result of your conduct.

Very Truly Yours,
ALLMAND ASSOCIATES, INC.
Nick Bogdanos
General Manager

ing the letter, but prior to December 27, 1993, Allmand switched to using TELENE, a product manufactured by Hercules' competitor, B.F. Goodrich.[17] Documents proffered by Hercules reveal that Allmand had been negotiating with B.F. Goodrich for over a year prior to sending notice of termination. As early as December of 1992, Allmand believed it would be ready to break its relationship with Hercules in January, 1993. According to Bogdanos' deposition testimony, the official decision to switch to TELENE was made a month or two prior to the issuance of the letter on September 23, 1993.

In defense, Allmand argues that it was excused from its duty to provide 90 day notice since Hercules breached the contract first. Allmand contends that Hercules breached its obligation under the GML Agreement to provide manufacturing know-how to Allmand. For reasons previously expressed in this opinion, this court finds that Hercules did not breach the GML Agreement. Hercules provided all the manufacturing know-how that was required of it, so this defense is of no avail.

■■■■■ Assuming arguendo that Hercules did breach the GML Agreement, such a breach would not excuse Allmand from its duty to give 90 days notice. It is clear that the duty to give notice was independent from the duty to provide manufacturing information.[18] Only when the promises are dependent, is a party first guilty of a substantial or material breach of contract estopped from complaining if the other party thereafter refuses to perform. 17A Am.Jur.2d *Contracts* § 621 (1991).[19]

Allmand also argues that summary judgment cannot be granted to Hercules on its claim of breach of the GML Agreement because there are genuine issues of material fact concerning Allmand's claims of breach of express and implied warranty, breach of contract and fraud and misrepresentation. Because this court has determined that there are no genuine issues of material fact and that Hercules is entitled to summary judgment as a matter of law on all Allmand's claims, this argument, too, must fail. Accordingly, this court finds that Allmand breached the GML Agreement by failing to provide 90 days notice of termination prior to using a competitor's product. Allmand had ample opportunity to provide such notice, for it had made the decision to switch to TELENE several months prior to the date that it sent the letter of termination.

As for the damages that Hercules is entitled to recover, this court finds further briefing is warranted on this issue.

### B. Count III—Breach of LMR Equipment Sales Agreement

Hercules also moves for summary judgement on Count III of its countercomplaint, which alleges breach of two LMR Equipment Sales Agreements.[20] Specifically, Hercules contends that Allmand has breached these agreements by failing to make timely payment.

■■■■ The undisputed facts relevant to this claim are that Allmand purchased equipment from Hercules pursuant to contracts entered into on January 24 and July 31, 1991.[21] The

17. Bogdanos testified that Goodrich started shipping TELENE two to four weeks after September 23, 1997.

18. In ascertaining whether a promise is dependent or independent of another promise, the intention of the parties controls. 17 Am.Jur.2d *Contracts* § 471 (1991).

19. Allmand cites to the case of *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166 (1969) in furtherance of its position. Allmand's reliance on *Hudson* is misplaced because in *Hudson* dependent promises were at issue, while the instant case involves independent promises. Specifically, *Hudson* involved a suit for specific performance against a builder who claimed that he

could not perform a contract to construct a residence at the agreed upon price due to rising costs. The court held that the builder was not excused from his performance because the purchase showed "freedom from fault with respect to performance of *dependent promises*, counterpromises or conditions precedent." *Id.* at 170.

20. This claim is governed by Delaware law pursuant to a choice of law clause in the contract.

21. For example, Allmand purchased a PPD vertical mold clamp assembly under the first contract. A vertical mold clamp assembly is a booking type clamp with 5 foot × 7 foot plastens and has 72 inches of daylight between platens when the moving platen is fully retracted. The clamp

total purchase prices of the contracts were $487,973.00 and $131,250.00,[22] respectively. Under the January 24, 1991 Agreement, Allmand was to pay the amount due before January 23, 1992, and under the July 31, 1991 contract, Allmand was to pay the amount due before January 24, 1992. On August 24, 1992, Allmand still had an outstanding balance of $499,223.00, so by letter agreement, the parties modified the payment terms of the equipment sales contracts. According to the modified payment schedule, Allmand was to pay Hercules $309,612.00 on or before September 1, 1992 and the balance by September 1, 1993 (but in no event later than September 1, 1994).

It is undisputed that, to date, there is an outstanding balance of $94,805.00. Allmand's representative, Nicholas Bogdanos, admitted that there was a balance outstanding on the equipment. Hercules has proffered the uncontested affidavit of Jay R. Reyher, Marketing Director, Adhesives, Hercules Resin Division, wherein he avers that "the balance due Hercules for the equipment purchased by Allmand Associates pursuant to the METTON® LMR Equipment Sales Agreements dated January 24, 1991 and July 31, 1991 is $94,805.00."

Although Allmand does not contest that it is delinquent in the amount of $94,805.00, it argues that Hercules is not entitled to summary judgment on its claim of breach of contract. Allmand insists that there are genuine issues of material fact with respect to Allmand's claims of breach of contract, breach of warranty, and fraud which preclude an entry of summary judgment for Hercules on its counterclaim of breach of the LMR Equipment Sales Agreements. Once again, this court has found that Hercules is

entitled to summary judgment on all Allmand's claims, so this argument lacks merit.

The uncontroverted evidence is that Allmand owes $94,805.00 for the equipment and therefore Allmand is in breach of the LMR Equipment Sales Agreements. Allmand continues to use the equipment sold by Hercules in the manufacture of molded articles with B.F. Goodrich's product, TELENE. Although Allmand asserts in its brief that the only reason it is doing so is to mitigate damages, it offers no admissible evidence by way of affidavit of otherwise to support this assertion. Hercules is entitled to summary judgment as a matter of law on Count III of its countercomplaint.

### C. Count IV—Breach of Contract to Purchase METTON®

Hercules also moves for summary judgment on Count IV of its countercomplaint, entitled "breach of contract to purchase material."[23] Hercules maintains that Allmand agreed, but refuses to pay for $191,230.00 of METTON® liquids sold and delivered.

Allmand does not dispute that it has not paid for $191,230.00 worth of METTON® delivered by Hercules, but argues that summary judgment cannot be granted for Hercules on this claim due to genuine issue of material fact which exist regarding Allmand's claims for breach of contract, warranty and fraud. Such an argument lacks merit, however, because this court has found that there are no genuine issues of material fact which preclude entering summary judgment in favor of Hercules. Consequently, Hercules is entitled to summary judgment on Count IV Of its countercomplaint.

---

has a clamping force of 100 tons and a stripping force of 50 tons and is designed to operate with a total mold weight of 15 tons. The assembly includes a hydraulic system consisting of a hydraulic pump, reservoir and water cooled heat exchanger. Also included is a control cabinet with a programmable controller to regulate all machine sequences along with all interconnecting wiring, piping and hoses.

**22.** Actually, the total purchase price was $152,850.00, but it was subsequently adjusted to $131,250.00.

**23.** This claim is premised upon the Order/Acknowledgment Forms which were sent with each shipment of liquid resin. Thus, it involves a contract for the sale of a good, and is controlled by the U.C.C.. Michigan Uniform Commercial Code section 440.1105 provides that if the parties do not include a choice of law clause in their agreement, then the Michigan Uniform Commercial Code controls, so long as the transaction bears an appropriate relation to Michigan. There is no dispute as to whether Michigan bears a rational relation to this contract.

### III. SUMMARY JUDGMENT MOTION NUMBER THREE: HERCULES MOTION FOR SUMMARY JUDGMENT AS TO THE RETOX UNIT CLAIM

Hercules also moves for summary judgment on its claim of breach of contract of the February 14, 1992 LMR Sales Equipment Agreement.[24] This agreement contained the terms and conditions governing the sale of an Airex regenerative oxidizer system, the "RETOX 2000," by Hercules to Allmand. Allmand purchased the unit to destroy pungent odors that were emitted in the METTON® process in an attempt to quell community complaints as well as put an end to the repeated citations it was receiving from the Wayne County Air Pollution Control.

The February 14, 1992 LMR Sales Equipment Agreement came with a "Performance Guarantee." The Performance Guarantee warranted that the RETOX 2000 would destroy 95% of the hydrocarbons entering the unit. In fact, Allmand did not have to pay for the unit until Hercules conducted a Performance Test and determined that the unit was greater than 95% efficient in removing the vapors that were captured by it. The relevant portion of the Performance Guarantee reads as follows:

> If all of the Performance Conditions are satisfied, then the Equipment will reduce the concentration of hydrocarbons measured at the discharge stack of the Equipment as compared to the concentration of hydrocarbons measured at the inlet of Equipment by an average of greater than 95 percent. The Performance Conditions are defined in this specification under the heading of "Design Criteria." The Equipment must be operated within design limits of 1700 to 2000 degrees F oxidation temperature.

Note that the Performance Guarantee did not warrant that the unit would capture any certain amount of vapors in the air (e.g. 2,000 cubic feet per minute), but only guaranteed that the RETOX 2000 would destroy 95% of the vapors that it did capture.

Hercules argues that there is no question in this case that the Performance Guarantee has been satisfied. It insists that the RE-TOX 2000 is now destroying more than 95% of the captured vapors and therefore, summary judgment must be granted in its favor in the amount of the full purchase price, $91,000.00. Hercules presents results of a test conducted by it on or about September 21, 1992 where it was determined that the RETOX 2000 "destroyed 99.4% of the DCPD vapors that were captured." Hercules also proffers a letter dated February 2, 1995 written to the Wayne County Department of Public Health, Air Pollution Control Enforcement Division by Kevin Felster, Allmand's Maintenance and Facilities Manager. In his letter, he represents that "[t]he regenerative thermal oxidizer [RETOX 2000] has been proven 99.4–99.8% efficient in tests conducted by the O.E.M. [Hercules] loading D.C.P.D. [vapor] at the air inlet."

In response, Allmand maintains that the testing methods used by Hercules in 1992 were "flawed" and in support of that argument directs this court's attention to the deposition testimony of Felster.[25] This court has carefully reviewed Felster's testimony and can find absolutely no assertion by him that Hercules' tests were erroneous with respect to the amount of vapors the unit was destroying: All Fester testified to was that the unit was not capturing an adequate amount of vapors for Allmand's needs. He testified that at the time Hercules conducted its study in 1992, Allmand was "not seeing the levels of DCPD [vapors] entering the unit that we [Allmand] should have seen." He argues that at the time of testing, the unit was only capturing 1,529 cubic feet per minute (CFM) of air volume. According to Felster, 5,000 CFM was necessary to get adequate capture and ventilation from the molding area of Allmand's plant. To reiter-

**24.** This claim is governed by Delaware law pursuant to a choice of law clause in the contract.

**25.** It is interesting to note that the same individual who claims the test results were flawed and the unit is not operating at 99.5% efficiency is also the same person who wrote a letter to the Wayne County Department of Public Health, vouching that the RETOX 2000 was operating at 99.4–99.8% efficiency.

ate, what is relevant to the issue of whether the Performance Guarantee has been satisfied is not whether there was sufficient capture but rather whether there was 99.5% destruction of whatever air volume was captured. To this issue, Felster states, "that was the case during this test," meaning that the unit was destroying the amount represented in the Hercules' test results.

Once again, the plain unambiguous language of the Performance Guarantee only required that the amount of vapors measured at the "discharge stack" of the RETOX 2000 be 95% less than the amount of vapors at the "inlet." It did not promise that RETOX 2000 would capture any specific percentage of air volume. Accordingly, there is no genuine issue of material fact that the unit was destroying more than 95% of the hydrocarbons that it took in, and there is no question that the Performance Guarantee has been satisfied. According to the terms of the February 13, 1992 LMR Equipment Sales Equipment Agreement, Allmand must pay $91,000.00. Hercules is entitled to summary judgment on this claim.[26]

In sum, summary judgment must be entered for Hercules on all Allmand's claims, as well as Counts I, III, and IV of Hercules' countercomplaint and the RETOX claim. This court wants to make very clear that it has assumed all Allmand's factual assertions to be true, including all Allmand's allegations regarding the problems it experienced with METTON® and all the business it lost as a result of using METTON®. Although observing the terrible results Allmand encountered manufacturing with METTON®, the fact of the matter is that Allmand has not presented this court with any argument establishing that it has a viable claim entitling it to damages or any colorable defense enabling it to avoid its obligations under the various agreements signed by the parties.

### ORDER

IT IS HEREBY ORDERED that Hercules' motion for summary judgment on

Allmand's complaint be **GRANTED**, and Allmand's complaint be dismissed with prejudice.

IT IS FURTHER ORDERED that Hercules' motion for partial summary judgment on Counts I, III and IV of its countercomplaint be **GRANTED**.

IT IS FURTHER ORDERED that Hercules submit a brief not to exceed five (5) pages within ten (10) days of this order setting forth the damages it sustained as a result of Allmand's breach of the General Molder License Agreement (Count I of Hercules' countercomplaint). Allmand shall file a response to Hercules' brief not to exceed five (5) pages within 10(ten) days after service of the same. Hercules shall then file a reply brief within five (5) days of Allmand's response brief.

IT IS FURTHER ORDERED that Hercules' motion for summary judgment on the RETOX 2000 claim be **GRANTED**.

**SO ORDERED.**

---

26. Allmand also makes two other arguments in response to Hercules' motion for summary judgment on this claim which are wholly irrelevant. First, Allmand contends that it had to completely re-design and re-engineer the RETOX unit in 1995 and second its argues that it is currently using B.F. Goodrich's resin, TELENE, which emits less odor. Allmand offers no explanation and cites no case law as to why these two facts would excuse it from its payment obligation under the February 13, 1992 LMR Equipment Sales Agreement.