# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ROBERT DUNCAN,       :
             :
   Plaintiff,       :   K16C-12-020 JJC
             :   In and For Kent County
     v.        :
             :
STTCPL, LLC, SERVICE ENERGY,   :
LLC, and COASTAL PUMP AND    :
TANK, INC.,         :
             :
   Defendants.      :
             :

Submitted: December 9, 2019
Decided: February 19, 2020

## MEMORANDUM OPINION & ORDER

*Upon Defendants' and Plaintiff's*
*Motions for Summary Judgment – GRANTED*

Patrick C. Gallagher, Esquire, Jacobs & Crumplar, P.A., Wilmington, Delaware, Attorney for Plaintiff.

Mark F. Dunkle, Esquire, Elio Battista, Jr., Esquire, & Kyle F. Dunkle, Esquire, Parkowski, Guerke & Swayze, P.A., Wilmington, Delaware, Attorney for Defendants Service Energy, LLC, and STTCPL, LLC.

Kevin J. Connors, Esquire, Marshall Dennehey Warner Coleman & Goggin, Wilmington, Delaware, Attorney for Defendant Coastal Pump and Tank, Inc.

Clark, J.

Before the Court are a motion for summary judgment filed by Defendants STTCPL, L.L.C and Service Energy, L.L.C (hereinafter collectively "Service Energy"),[1] and a motion for summary judgment filed by Defendant Coastal Pump & Tank, Inc. (hereinafter "Coastal"). Plaintiff Robert Duncan also files a cross-motion for partial summary judgment. Combined, these motions turn on four principal issues. First, they center on the enforceability of a 2009 Settlement Agreement and Release of Claims (the "2009 Agreement") and its impact on who should pay for environmental contamination at a Harrington gas station (the "Site"). Second, they turn on whether Mr. Duncan, or separately Service Energy in its counterclaim, have identified sufficient evidence of record to support their competing damages claims. Third, Mr. Duncan's motion for partial summary judgment focuses on whether Mr. Duncan's breach of the 2009 agreement excused Service Energy's payment of rent due under a lease. Fourth, the parties' competing claims for attorneys' fees require the Court to identify who was the prevailing party.

On this record, summary judgment must be **GRANTED** in favor of Service Energy and against Mr. Duncan with regard to his contract claims and direct claims for negligence. Service Energy's counterclaim for indemnification under the 2009 Agreement also fails on this record because Service Energy identifies no evidence that supports its damages claim to a reasonable degree of certainty. Furthermore, Coastal's motion for summary judgment regarding Mr. Duncan's negligence claim is **GRANTED** because Mr. Duncan presents no evidence of monetary damage. Finally, Mr. Duncan's breach of the 2009 Agreement did not excuse Service Energy's obligation to pay rent under what is a separate contract. As a result, Mr. Duncan's motion for partial summary judgment regarding rent due is also **GRANTED.** All parties must bear their own fees and costs.

---

[1] Although the Court collectively referred to these parties as "STTCPL" in its 2017 opinion, it now refers to them collectively as "Service Energy."

2

# I.    Facts of Record

The facts referenced herein are those of record.  Because there are cross-motions for summary judgment, they are viewed in the light most favorable to the non-movant on each issue.

In 1994, Mr. Duncan leased a gas station at the intersection of U.S. Route 13 and Delaware Route 14 in Harrington to New Dawn Energy (hereinafter "New Dawn")[2]  On January 4, 2000, Service Energy assumed New Dawn's lease.  When doing so, Service Energy, Mr. Duncan, and New Deal signed an Assignment and Lease Modification Agreement (hereinafter "the 2000 Agreement").   In the 2000 Agreement, Mr. Duncan accepted responsibility for environmental damage to the Site prior to the start of Service Energy's tenancy in January 2000.[3]  On the other hand, the original lease contained a provision that made Service Energy responsible for any environmental damage to the land *after* Service Energy became the tenant.[4]  When assuming the lease, Service Energy purchased five existing underground storage tanks ("USTs") and gas dispensers from New Dawn.

In February 2000, Service Energy retrofitted the property.  It removed leftover petroleum from the USTs and replaced the lines running from the USTs to the dispensers.  Service Energy's contractor then sampled the soil surrounding the dispensers and the USTs.  The sampling revealed released petroleum.  Delaware's Department of Natural Resources and Environmental Control (hereinafter

---

[2] Pl. Opening Brief, Ex. A, at 8:13–9:11.

[3] Def. Service Energy App'x to Opening Brief, at A0310–11 (providing "[t]he Landlord shall be responsible for and shall hold harmless STTCPL ... from any claims for environmental damage which has occurred prior to the time that they have become a tenant on the property.").

[4] *See* Pl. App'x to Answering Brief, at B01089 ¶ 20 (providing that "[l]essee will indemnify and hold Lessor harmless against, all claims, demands and causes of action, including reasonable costs expenses and attorney fees of Lessor incident thereto, for injury to or death of any person or loss of or damage to any property arising from Lessee's tenancy of the premises and not caused by the negligence omission, intentional act or breach of duty by Lessor or its agents")

"DNREC") then opened Project K0009122 to investigate the Site.[5] Neither the parties nor DNREC further pursued Project K0009122 for seven years. After seven years of inactivity, DNREC sent Service Energy a letter renewing its demand that Service Energy investigate the petroleum release.

Service Energy then performed a second UST retrofit in early 2008 after its testing showed that its cathode protection system needed replacement. Once again, Service Energy hired a contractor to take samples. The results revealed contamination. DNREC then opened a second investigation, Project K0804036. In response, Service Energy hired contractors to retest the groundwater and soil. Those results revealed the nature of the contamination. It included benzene, toluene, ethylbenzene, xylenes ("BTEX"), methyl tertiary butyl ether ("MTBE"), and tertiary amyl methyl ether ("TAME") in the groundwater,[6] benzene and MTBE at various depths in the soil,[7] and tetraethyl lead ("TEL") in the soil, which was a lead-based fuel banned by the EPA in 1996.[8]

At that point, Service Energy sought indemnification from Mr. Duncan under the 2000 Agreement. It alleged that all contamination on the Site pre-dated 2000. With its demand, Service Energy provided Mr. Duncan a testing report from one of its contractors, Atlantic Hydrologic, Inc.[9]

Initially, Mr. Duncan disputed responsibility. In response to Service Energy's demand, he hired his own attorney and his own environmental consultant.[10] After doing so, he chose to settle with Service Energy. The parties then executed the 2009 Agreement.[11]

---

[5] *Id.* at A0191–92.
[6] *Id.* at A0026.
[7] *Id.* at A0025.
[8] *Id.* at A0264–67.
[9] *Id.* at A0321–23.
[10] *Id.* at A0324–25.
[11] *Id.* at A0001–05.

4

The 2009 Agreement recited Service Energy and Mr. Duncan's disagreement regarding the "extent, timing of, and responsibility for, the alleged damage at the [Site]."[12] After referencing this dispute, Mr. Duncan accepted "responsibility for all costs, fees and expenses from [May, 12, 2009] forward for the further investigation and/or remediation and monitoring required by DNREC."[13] He also agreed to "release Service Energy from any such future costs, fees and expenses relating thereto[.]"[14] The parties agreed to a "full and final settlement of any and all claims . . . relating to the further investigation and/or remediation and monitoring required by DNREC (Project ID's K0009122 and K0804036)[.]"[15] In a separate paragraph, the 2009 Agreement also limited Mr. Duncan's responsibility, in part, to:

> solely those environmental matters currently identified by DNREC and the remediation required by DNREC in regard thereto (including both the remediation currently required by DNREC and any future DNREC required remediation as to the currently identified environmental issues).[16]

Mr. Duncan then hired Advantage Environmental Consultants ("AEC"). After AEC's tests confirmed contamination, AEC recommended, and DNREC accepted,[17] monthly and quarterly groundwater monitoring. In the short term, Mr. Duncan took no further steps. DNREC then wrote Mr. Duncan in February 2011, but he still took no action.[18] On January 23, 2012, DNREC issued a Notice of Violation (hereinafter "2012 NOV") to Mr. Duncan and Service Energy for projects

---

[12] *Id.* at A0001.
[13] *Id.*
[14] *Id.*
[15] *Id.* at A0003.
[16] *Id.*
[17] *Id.* at A0333.
[18] *Id.* at A0334–37.

5

K0009122 and K0804036.[19]  In response, Mr. Duncan directed AEC to conduct groundwater monitoring from June 2013 to December 2013.[20]  The monitoring reconfirmed contamination.[21]

By December 2013, Service Energy's lease ended and it decided to remove its five USTs.  To do so, it hired Coastal.  On December 8, 2013, Coastal removed them and some of the contaminated soil that surrounded them.  A DNREC UST Closure Report confirmed that, upon removal, the tanks had no holes or leaks that could have caused new contamination.[22]  In other words, no gas had leaked from them.

After removing the USTs, Coastal placed the contaminated soil taken from the pits back into the then-empty pits.  Coastal finished filling the pits with new uncontaminated soil that it brought to the Site.  The parties dispute who directed that action.  Conflicting testimony of record includes that: (1) Mr. Duncan directed Coastal to place the soil back into the pits after DNREC provided him three options for handling the soil; (2) Service Energy directed Coastal to refill the pits with the contaminated soil; (3) DNREC told Coastal to do it; and (4) Coastal decided itself to return the soil to the pits.  Regardless of who directed the action, Coastal returned the contaminated soil to the pits.  DNREC then opened a third investigation, Project K1401002, based upon sampling taken during the USTs' removal.

After continued delay, DNREC assumed control of the Site and hired its own contractor to remediate it.  It cost DNREC $562,014.  On June 6, 2014, Service Energy and DNREC executed a settlement agreement that required Service Energy

---

[19] *Id.* at A0338–42 (acknowledging the 2009 Agreement, but explaining that no additional investigation had taken place and that Mr. Duncan and Service Energy were both responsible parties by statute).
[20] *Id.* at A0460.
[21] *Id.*
[22] *Id.* at A0422.

6

to (1) pay DNREC $70,000, and (2) withdraw the appeal it had filed regarding the 2012 NOV.[23] In addition to resolving issues regarding the Site, the settlement also released DNREC's claims against Service Energy for its environmental liability at two other gas stations: the Milford Soda Center and Smyrna Soda Center.[24]

Over a two year period, Service Energy withheld $48,000 in rent for the Site. After doing so, Service Energy notified Mr. Duncan that it applied this $48,000 to its $70,000 settlement with DNREC.[25] Apart from the $70,000 that Service Energy paid DNREC, Mr. Duncan paid DNREC $250,000 to resolve its claim against him for the remaining $492,014 in remediation costs.[26]

Mr. Duncan's then sued Service Energy and Coastal. He hired an environmental expert to offer an opinion identifying the time of the contamination and the effects of Coastal's return of the soil to the UST pits. In response, Service Energy counter-claimed for indemnification. Service Energy and Coastal then jointly hired their own expert.

Mr. Duncan's expert, Anthony Grow, opines that Service Energy worsened the contamination. Also, he opines that between 2000 and 2008, Service Energy failed (1) to notify Mr. Duncan that it discovered a release, or (2) to conduct any follow up investigation.[27] He further opines that the source of the contamination discovered after 2000 came from Service Energy's modifications to its dispenser lines.[28] With regard to the 2013 UST removals, Mr. Grow opines that Coastal violated State and Federal regulations by returning contaminated soil to the pits.[29]

---

[23] *Id.* at A0343–44.
[24] *Id.* at A0344 (releasing Service Energy from all claims of environmental damage "on the referenced Smyrna Soda Center, Milford Soda Center and Harrington Soda Center properties and all adjoining properties").
[25] Pl. Opening Br., Ex. E, at 90:1–93:13.
[26] Pl. App'x to Answering Brief, at B0507:10–18.
[27] Def. Service Energy App'x to Opening Brief, at A0504.
[28] *Id.*
[29] *Id.* at A0505.

He claims that comingling contaminated soil in the amount of the volume of the tanks removed with new fill increased remediation costs.[30] Finally, he contends that the study that Mr. Duncan and Service Energy relied upon before they executed the 2009 Agreement was misleading. Namely, he opines that the study wrongly induced Mr. Duncan to believe that he was the responsible party.[31]

Service Energy and Coastal's expert, Paul Miller, provides contrary opinions. Primarily, Mr. Miller opines that: (1) all gasoline spills or leaks at the Site occurred prior to the 2009 Agreement; (2) there has been no gasoline release since the 2009 Agreement; (3) Service Energy and Coastal did not make the decision to return the contaminated soil to the pits; and (4) they are not responsible for costs necessary to remove the soil.[32] He also notes the presence of MTBE in the samples and opines that its presence demonstrate that any gasoline releases must have occurred between 1979 and 2006, thereby predating the 2009 Agreement.[33] Finally, he notes the absence of ethanol in the samples that he says further confirms that there were no gasoline releases after 2006.[34]

## II.    The Parties' Arguments

### A.    Service Energy's Motion for Summary Judgment

In its motion, Service Energy first argues that the 2009 Agreement bars Mr. Duncan's environmental damage claims, both in contract and negligence. It argues that the 2009 Agreement makes Mr. Duncan financially responsible for the environmental contamination because the remediation costs came from the two projects referenced in the 2009 Agreement (Projects K0009122 and K0804036).

---

[30] *Id.* at A0505–06.
[31] *Id.*
[32] *Id.* at A0036–37.
[33] *Id.* at A0035.
[34] *Id.*

8

According to it, there is no evidence of record demonstrating environmental damage that was unrelated to these two DNREC projects. Furthermore, Service Energy argues that the 2012 NOV (which references a third project identified as K1401002) resulted solely from the delay in addressing the two enumerated projects referenced in the 2009 Agreement. Accordingly, it argues that addressing the third DNREC project is also Mr. Duncan's responsibility. Finally, Service Energy seeks reimbursement from Mr. Duncan for the amount it paid DNREC—$70,000 less the $48,000 it withheld in rent.

Service Energy separately seeks summary judgment regarding Mr. Duncan's negligence claim involving Coastal's 2013 actions. It argues that (1) there is no evidence that Coastal acted negligently when it returned the contaminated soil to the pits in 2013, and (2) Coastal was not Service Energy's agent for purposes of vicarious liability. Finally, Service Energy argues that (3) Mr. Duncan's claims independently fail because he identifies no evidence regarding the cost necessary to remedy Coastal's alleged negligence.

Mr. Duncan seeks to avoid the 2009 Agreement entirely. Without the 2009 Agreement, Service Energy's obligations would fall back to those of the 1994 master lease and the 2000 Agreement. In seeking to avoid the 2009 Agreement's terms, he claims that he signed it because Service Energy misrepresented that the contamination on the Site predated the 2000 Agreement. In the alternative, he argues that a mutual mistake as to that fact voids the 2009 Agreement.

Furthermore, Mr. Duncan argues that his claims regarding the third DNREC project, K1401002, are not barred by the 2009 Agreement. Specifically, he argues that the harm identified as Project K1401002 resulted from the 2013 tank removal, which is different than the harm identified by the first two DNREC projects. Finally, he argues that there are genuine disputes of fact regarding whether Coastal was an agent of Service Energy when it removed the USTs.

9

## B.     Coastal's Motion for Summary Judgment

Coastal seeks summary judgment dismissing Mr. Duncan's negligence claims regarding its removal of the USTs in 2013.  It argues that it owed Mr. Duncan no duty, and if it did, it did not breach that duty.  It also maintains that returning the soil to the pits was a DNREC authorized option.  Finally, Coastal argues that Mr. Duncan identifies no evidence of record supporting his damages claim because there is no evidence of record regarding an increase in remediation costs caused by Coastal's return of the contaminated soil to the pits.

In response, Mr. Duncan cites regulations that he alleges create duties that Coastal minimize the spread of environmental contamination.   He also argues that conflicting expert opinions create an issue of fact regarding Coastal's breach of those duties.  He further emphasizes the conflicting testimony regarding who told Coastal to return the contaminated soil to the pits.  Finally, he concedes that although he has no expert opinion quantifying damages, Coastal directly, and Service Energy vicariously, are liable for all environmental harm to the Site because the 2013 alleged injury is indivisible when considered with the pre-2009 contamination.


## C.     Mr. Duncan's Motion for Partial Summary Judgment

Mr. Duncan seeks summary judgment regarding his claim against Service Energy for unpaid rent.  The parties' lease set rent at $2,000 a month.  He argues that Service Energy unjustifiably withheld this rent for two years.  He emphasizes that the 2000 Agreement (that incorporates the 1994 master lease) and the 2009 Agreement are two separate contracts.  Accordingly, he maintains that Service Energy's obligation to pay rent is not dependent upon his performance of the 2009 Agreement.

In response, Service Energy argues that Mr. Duncan's breach of the 2009 Agreement excused its obligation to pay rent for the Site. In so arguing, Service Energy seeks what would be the commercial equivalent of a repair and deduction remedy.[35] Part and parcel of its opposition to Mr. Duncan's rent claim, Service Energy also seeks an additional $22,000 from Mr. Duncan under the 2009 Agreement's indemnification provision. That amount represents the difference between the $70,000 Service Energy paid DNREC and the $48,000 of diverted rent.

### III. Standard of Review

Summary judgment is appropriate only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[36] The Court must view the evidence in the light most favorable to the non-moving party.[37] The burden of proof is initially on the moving party.[38] However, if the movant meets his or her initial burden, then the burden shifts to the non-moving party to demonstrate the existence of material issues of fact.[39] The non-movant's evidence of material facts in dispute must be sufficient to withstand a motion for judgment as a matter of law and to support the verdict of a reasonable jury.[40]

When parties file cross-motions for summary judgment, the standard for summary judgment is the same.[41] In this regard, "the existence of cross-motions for summary judgment does not act *per se* as a concession that there is an absence of factual issues."[42] Instead, "a party moving for summary judgment concedes the

---

[35] *C.f.* 25 *Del. C.* § 5307 (providing the tenant remedy of repair and deduction in the *residential* landlord-tenant context). There is no commercial landlord-tenant statutory equivalent.

[36] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[37] *Brozaka v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

[38] Super. Ct. Civ. R. 56(e); *Moore*, 405 A.2d at 680 (Del. 1979).

[39] *Moore*, 405 A.2d at 681 (citing *Hurtt v. Goleburn*, 330 A.2d 134 (Del. 1974)).

[40] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).

[41] *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. Mar. 23, 2001).

[42] *Id.*

absence of a factual issue and the truth of the nonmoving party's allegations only for the purposes of its own motion."[43]  The party "does not waive its right to assert that there are disputed facts that preclude summary judgment in favor of the other party."[44]  Thus, "cross-motions for summary judgment are not the procedural equivalent of a stipulation for a decision on a 'paper record.'"[45]  Nevertheless, pursuant to Superior Court Civil Rule 56(h), where the parties file cross-motions and "have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[46]

## IV.  Discussion

The parties' cross-motions require the Court to resolve four principal issues. First, the Court must determine if it can resolve, at the summary judgment stage, whether the 2009 Agreement is enforceable.  If it can resolve the issue at this stage and if the 2009 Agreement is enforceable, the Court must determine the extent to which it bars Mr. Duncan's claims.  Second, the Court must determine if either Mr. Duncan or Service Energy separately demonstrate material issues of fact regarding an amount of damages.  Finally, because Mr. Duncan and Service Energy both seek attorneys' fees for successfully enforcing the agreement, the Court must determine whether either party, or both parties, may recover attorneys' fees.

---

[43] *Id.*

[44] *Id.*

[45] *Lukk v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 4247767, at *3 (Del. Super. Aug. 27, 2014) (quoting *Empire of America Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del. 1988)).

[46] Super. Ct. Civ. R. 56(h); *Food & Water Watch v. Delaware Dep't of Nat. Res. & Envtl. Control*, 2019 WL 6481888, at *2 (Del. Super. Nov. 27, 2019).

**A.** **There is no genuine dispute of fact regarding the 2009 Agreement's enforceability; the agreement bars Mr. Duncan's claims for contamination arising out of projects K0009122 and K0804036 and Mr. Duncan identifies no evidence of new contamination that is not related to those two projects.**

The Court examined the 2009 Agreement when it denied Service Energy's motion to dismiss.[47] Mr. Duncan's claim survived that motion because he alleged there was new contamination that the 2009 Agreement did not release.[48] In its decision, the Court alternatively reviewed the 2009 Agreement's potentially conflicting provisions for ambiguity. The now fully developed evidentiary record, at the summary judgment stage, provides necessary context. Given this record and a further review of the agreement's terms, Mr. Duncan's environmental damages claims do not survive summary judgment. The 2009 Agreement is unambiguous, and Mr. Duncan identifies no evidence of new contamination apart from that for which he assumed responsibility.

Under Delaware law, courts "adhere[] to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party."[49] When interpreting a contract, courts focus on the parties' intent as demonstrated by the agreement's four corners: when doing so, it construes the contract as a whole, giving effect to all its provisions if possible.[50] Namely, the contract's terms control "when a reasonable person in the parties' positions would have no expectations inconsistent with the contract language."[51] The courts may use extrinsic evidence to interpret the intent of the parties only if the terms are

---

[47] *Duncan v. STTCPL, LLC*, 2017 WL 816477, at *4 (Del. Super. Feb. 28, 2017).

[48] *Id.* at *6.

[49] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[50] *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[51] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

ambiguous.[52]   A dispute over a contract's terms does not alone make a contract ambiguous.[53]

Four paragraphs in the 2009 Agreement are primarily at issue.  They provide:

1.      Duncan hereby assumes the responsibility for all further investigation and/or remediation and monitoring required by DNREC in connection with the alleged environment damage at the Harrington location.

.          .          .

3.      Duncan hereby assumes the financial responsibility for all costs, fees and expenses relating to or arising out of all further required investigation and/or remediation and monitoring required by DNREC at the Harrington Location.

.          .          .

8.      The parties hereby acknowledge that the terms of this Agreement have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final settlement of any and all claims, demands, liabilities, attorneys' fees, and/or costs which either party or his/her successors, heirs, and assigns may have had, may now have, or may in the future have relating to the further investigation and/or remediation and monitoring required by DNREC (Project ID's K0009122 and K0804036) at the Harrington Location and *for the express purpose of precluding forever any future or additional claims arising out of the same* except for those that may be related to the enforcement of this agreement.

.          .          .

9.      The parties hereby acknowledge and agree that the responsibility and/or liability for environmental matters at the Harrington location assumed by Duncan under this Agreement is limited to solely those environmental matters currently identified by DNREC and the remediation required by DNREC in regard thereto (including both the remediation currently required by DNREC *and any future DNREC*

---

[52] *Id.*

[53] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018).

14

*required remediation as to the currently identified environmental issues*).[54]

When giving effect to all of these provisions, the 2009 Agreement unambiguously released Mr. Duncan's claims. Namely, he assumed responsibility for DNREC identified matters as of the time he executed the 2009 Agreement. He also accepted responsibility for any future investigation, remediation, or monitoring arising out of those same matters.[55] In other words, Mr. Duncan assumed full responsibility for all identified matters and future problems arising from the then-existing contamination. He retained only the right to seek indemnification for *new* contamination after 2009.

Mr. Duncan attacks the 2009 Agreement's enforceability by alleging that Service Energy induced him to sign it through misrepresentation. He also alternatively claims that he can avoid the 2009 Agreement because of the parties' mutual mistake that the contamination preceded the 2000 Agreement. He amended his complaint to include these two claims. When doing so, he essentially raised affirmative defenses to Service Energy's affirmative defense of release.

With regard to misrepresentation, a contract is voidable if procured by misrepresentation, either fraudulent or innocent.[56] In order to avoid a contract on that basis, "a party must demonstrate four elements: (1) that there was a misrepresentation; (2) that the misrepresentation was either fraudulent *or* material; (3) that the misrepresentation induced the recipient to enter into the contract; and (4) that the recipient's reliance on the misrepresentation was reasonable."[57] Mr. Duncan bears the burden to demonstrate evidence sufficient to avoid the effects of the 2009

---

[54] Def. Service Energy App'x to Opening Brief, at A0002–03 (emphasis added).
[55] *Id.* at A0003.
[56] *Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1361 (Del. Super. Aug. 1, 1990).
[57] *Id.* at 1361–62 (citing 1 Restatement (Second) of Contracts, § 164) (emphasis added).

15

Agreement. He adequately demonstrates material issues of fact regarding the first two elements of this claim. He does not, however, demonstrate a genuine issue of fact regarding the third or fourth elements. For ease of reference, the Court will refer to those two elements collectively as "reasonable reliance."

Here, no reasonable jury could find, based on the evidence of record when considered in the light most favorable to Mr. Duncan, that reliance upon Service Energy's litigation position was reasonable. First, the alleged misrepresentation that the contamination pre-dated 2000 came in a settlement demand letter from Service Energy's attorney. No reasonable person in Mr. Duncan's position would have blindly relied upon that representation. In fact, he did *not* rely upon it. Rather, after he received the letter, he hired his own environmental consultant and attorney who reviewed the results that Service Energy provided. He had a full opportunity to validate or contest those results. Given such undisputed facts, no reasonable jury could find that a person in Mr. Duncan's position reasonably relied upon the assertions made in an attorney-drafted, one-sided demand letter.

Furthermore, the recitations in the 2009 Agreement also contradict Mr. Duncan's assertion. It recites, in relevant part, the following:

A.  WHEREAS Duncan and Service Energy disagree as to the extent, time of, and responsibility for, the alleged environmental damage at the Harrington location . . .

.   .   .

C.  WHEREAS Duncan and Service Energy wish to resolve their dispute concerning indemnification and responsibility.[58]

This language in the 2009 Agreement directly contradicts Mr. Duncan's claim that he accepted and relied upon Service Energy's testing and representations that the contamination pre-dated the 2000 Agreement. One does not rely upon a statement that he or she disagrees with.

---

[58] Def. Service Energy App'x to Opening Brief, at A0001.

The sole evidence supporting Mr. Duncan's misrepresentation claim is his own testimony. It, however, is contradicted by all circumstances of record and the terms of the 2009 Agreement. On balance, even if Mr. Duncan relied upon Service Energy's position when deciding to settle in 2009, no reasonable jury could find his reliance to be reasonable.

In the alternative, Mr. Duncan submits that he executed the 2009 Agreement as the result of a mutual mistake. A portion of the contract releases Mr. Duncan's claims. Although valid releases are generally upheld, "a clear and unambiguous release [may be set aside] where there is . . . [a] mutual mistake concerning the existence of a party's injuries."[59] In order "[t]o establish a mutual mistake of fact, the plaintiff must show . . . that (1) both parties were mistaken as to a basic assumption, (2) the mistake materially affects the agreed-upon exchange of performances, and (3) the party adversely affected did not assume the risk of the mistake."[60] The mutual mistake must exist at the time of contract formation, as well as "relate to a past or present fact material to the contract and not to an opinion respecting future conditions as a result of present facts."[61]

With regard to the efficacy of a release, if the party that asserts a mutual mistake is aware of an "*indicia* of injuries," then a court will not invalidate the release because of a mistake regarding the nature or degree of injury.[62] In other words, the mere knowledge that an injury exists precludes a finding of mutual mistake in the context of a release's enforceability.[63] Furthermore, "a mutual

---

[59] *Alvarez v. Castellon*, 55 A.3d 352, 354 (Del. 2012) (citing *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010)).

[60] *Hicks v. Sparks*, 89 A.3d 476, 2014 WL 1233698, at *2 (Del. 2014) (TABLE).

[61] *Id.*

[62] *Id.* (describing the extent of a plaintiff's knowledge necessary to preclude a mutual mistake claim in the personal injury and insurance context).

[63] *Hicks v. Doremus*, 1990 WL 9542, at *2 (Del. Super. Jan. 8, 1990) (explaining that it is the knowledge of an injury's existence that matters for a mutual mistake defense, not knowledge of an injury's extent or degree).

mistake does not exist if the party assumed the risk of the mistake."[64] A party assumes the risk of the mistake when (1) the contract assigns the risk to the party, or when (2) the party performs his or her obligations under the contract when aware of his or her limited knowledge with respect to the facts to which the mistake relates.[65]

Here, Mr. Duncan's mutual mistake argument fails largely for the same reasons as his misrepresentation claim. Primarily, there can be no mutual mistake between the parties where they disagreed regarding the timing and origin of the contamination. The 2009 Agreement specifically recognized the parties' dispute. It represented a compromised resolution of that dispute.[66] If the parties disagree regarding a binary choice, such as whether contamination occurred before or after a certain date, then only one of the parties is mistaken. In such an instance, there was no *mutual* mistake.

Furthermore, the undisputed record demonstrates Mr. Duncan's knowledge of more than an "indicia of injuries" at the Site. Although he may not have known the extent of the contamination, the 2009 Agreement itself demonstrates that he knew contamination was present and he nevertheless released Service Energy from responsibility for it. In this regard, Mr. Duncan's mutual mistake argument also fails because he contractually assumed the risk for any such mistake. In fact, a primary purpose of the 2009 Agreement was to assign the risk to him.

Since neither misrepresentation nor mutual mistake invalidate the 2009 Agreement, it is enforceable.[67] It released Mr. Duncan's claims for all then-existing contamination and the future costs for remediating that contamination.

---

[64] *Sparks*, 2014 WL 1233698, at *2.

[65] *Id.* (citing Restatement (Second) of Contracts § 154(a)–(b)).

[66] *See* Def. Service Energy App'x to Opening Brief, at A0001 (providing that the parties "disagree as to the extent, time of, and responsibility for, the alleged environmental damage at the Harrington location" but "wish to resolve their dispute concerning indemnification and responsibility").

[67] Because the 2009 Agreement is enforceable, the Court need not address Service Energy's statute of limitations argument.

Accordingly, the Court must next turn to whether the evidence of record supports a reasonable inference that new contamination occurred at the Site after 2009.

With regard to Service Energy's prior motion to dismiss, allegations in Mr. Duncan's complaint that there was new contamination related to the 2012 NOV provided a conceivable basis for Mr. Duncan to recover at the Rule 12(b)(6) stage.[68] At the summary judgment stage, however, Service Energy now steps forward with evidence that no new contamination occurred after 2009. The burden thus shifts to Mr. Duncan to demonstrate a factual issue. In response, he identifies no facts of record that could support a reasonable jury's finding that there was new contamination.

Mr. Duncan claims that Coastal's 2013 re-filling of the pits with the contaminated soil constituted new contamination. The record, however, supports only a finding *that all contaminants were on site prior to the 2009 Agreement*. The initial testing results from the Site prior to the 2009 Agreement revealed a deep, widespread petroleum release already present in the property's groundwater. Furthermore, based upon changes in chemical components and additives in gasoline, testing results support *only* an inference that the released gasoline was manufactured *prior* to 2009. Testing done after the 2009 Agreement and the 2012 NOV by Mr. Duncan, DNREC, and eventually BSTI, reflect the same conclusion. Those results permit no inference of post-2009 environmental damage.

Although Mr. Duncan argues that the 2013 USTs removal constituted a new petroleum release requiring a new DNREC project, he identifies no evidence that the actual contaminants were anything other than those previously identified. Post-removal testing of the USTs showed no holes or leaks in their structures that could

---

[68] *Duncan*, 2017 WL 816477, at *6.

have permitted new petroleum releases.[69]  Also, as explained above, sampling results from 2013 continued to show the presence of the same chemicals in the gasoline, such as MTBE and TEL, which evidence its manufacture prior to 2009.  In contrast, there is no evidence of record that permits a reasonable inference that an additional leak, spill, or release occurred during or after the 2013 USTs removal.

In summary, the record evidence does not support Mr. Duncan's argument that there was any new contamination at the Site that the 2009 Agreement did not address.  Even when viewed in the light most favorable to Mr. Duncan, the facts provide only one reasonable inference: that Mr. Duncan released all contract claims and direct negligence claims against Service Energy.

> **B.  Although the 2009 Agreement provides a basis for Service Energy's indemnification claim, Service Energy identifies no non-speculative evidence of damages specific to the Harrington Site.**

Mr. Duncan's direct environmental damage claims against Service Energy are barred by the 2009 Agreement as a matter of law.  Given the agreement's enforceability and its indemnification provision, Service Energy has the contractual right of indemnification for losses that fall within the agreement's scope.  Accordingly, the Court must consider the merits of Service Energy's indemnification counterclaim.  When doing so, the claim fails on this record.

In any breach of contract claim, the party bringing the claim must demonstrate that it suffered damages.[70]  A party's proof of damages cannot be speculative and must permit a jury to "assess damages to a reasonable degree of certainty."[71]  Service

---

[69] Def. Service Energy App'x to Opening Brief, at A0036 (discussing DNREC's documentation that during the USTs removal "there were no holes, corrosion, or ruptures in the tanks and piping removed in December 2013").

[70] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Feb. 4, 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

[71] *Town of Townsend v. Grassbusters, Inc.*, 2019 WL 3493904, at *4 (Del. Super. Aug. 1, 2019). *See also Interim Healthcare, Inc.*, 884 A.2d at 571 (explaining that because the plaintiffs' made

Energy bases the damages element of its indemnification claim solely upon the amount it paid to DNREC—$70,000.[72] Otherwise, it identifies no evidence of record to meet its burden on summary judgment regarding its damages.

The DNREC settlement agreement and payment alone do not provide a basis for a jury to quantify the harm suffered by Service Energy to a reasonable degree of certainty. Namely, the settlement agreement with DNREC acknowledged that the payment related to more than just the Site. It released DNREC's claims for "the contamination of soils and groundwater and any other environmental damage on the referenced *Smyrna Soda Center, Milford Soda Center and Harrington Soda Center properties and all adjoining properties*."[73] For releasing its claims regarding these three sites, DNREC required Service Energy to "make payment to [it] in the amount of Seventy Thousand Dollars ($70,000.00)."[74]

Service Energy identifies nothing in the record that explains how the lump sum $70,000 it paid to DNREC was allocated among these three locations. Service Energy identifies no evidence specific to the Site. On this record, a jury would be required to speculate regarding the amount, if any, allocated to the Site as opposed to the other two leased gas stations. Accordingly, Service Energy's indemnification claim does not survive summary judgment.

---

"no effort to secure a breakdown or itemization of the specific claims" or "explain or justify the manner in which the . . . claims were settled" that the "damages [were] too speculative and [] not subject to 'a reasonable basis for computation,'" so the indemnification claim failed).

[72] *See* Def. Service Energy Resp. to Amend. Compl. ¶ 38 (claiming that "[a]s a result of Duncan's failure to fulfill his obligations under the 2009 Release, Service Energy incurred $70,000.00 in damages paid to DNREC which amount accrued to Duncan's benefit").

[73] Def. Service Energy App'x to Opening Brief, at A0344 (emphasis added).

[74] *Id.*

21

**C.** **Mr. Duncan identifies insufficient evidence to quantify the damages allegedly caused by any new negligent acts by Coastal in 2013.**

Mr. Duncan sues Coastal for its alleged 2013 negligence. It also sues Service Energy vicariously for Coastal's negligence. To prove negligence, a plaintiff must prove that the defendant owed plaintiff a duty, that the defendant breached that duty, and that the defendant's negligent act proximately caused the plaintiff's injury.[75] Here, conflicting expert testimony and disputes regarding who directed Coastal create issues of fact regarding duty and breach. Namely, Mr. Grow and Mr. Miller provide contrary opinions regarding Coastal's duties. Mr. Grow claims that Coastal had the duties (1) to take reasonable care in disposing of the contaminated soil, and separately, (2) under State and Federal UST regulations, to not return the contaminated soil to the pits.[76] In contrast, Mr. Miller opines (1) that neither Coastal nor Service Energy controlled the decision to refill the pits with contaminated soil, and thus (2) DNREC's direction that Coastal take that action means Coastal did not violate the regulations. These competing expert opinions create genuine issues of material fact regarding duty and breach.

As to proximate cause, Mr. Grow's expert testimony creates an issue of fact regarding whether Coastal proximately caused some increased contamination.[77] When considering a claim for negligence, the "negligent act is not in itself actionable, [and it] only becomes the basis of an action where it results in injury to another."[78] Proving proximate cause of *a harm* is necessary but is not alone

---

[75] *Spencer v. Goodill*, 17 A.3d 552, 554 (Del. 2011).
[76] Def. Service Energy App'x to Opening Brief, at A0505.
[77] Mr. Grow's deposition testimony explains that filling the pits with contaminated soil and putting the contamination in the presence of non-contaminated soil causes a migration and spread of the existing contamination. Pl. App'x to Answering Brief, at B0695:15–96:7. This constitutes evidence that returning the soil to the pits was a but-for cause of spreading the contaminants.
[78] 57A Am. Jur. 2d Negligence § 131.

sufficient. Namely, "the mere existence of a wrong, without some identifiable damage, provides no basis for a cause of action."[79] Without proof of physical damage to property, there can be no recovery in negligence.[80] Here, Duncan and Service Energy point to the lack of an expert opinion regarding *the amount* of money damages. In response, Mr. Duncan does not step forward with evidence of record that supports *the amount* of the alleged harm.

When a claim involves harm to land, damages may include compensation for the reasonable costs for past and future restoration.[81] If restoration costs are sought, "the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery."[82] A plaintiff can recover these damages "only by proving this with the same degree of certainty as that required in proving the existence of the cause of action."[83] Namely, in negligence "the law does not permit a recovery of damages which is merely speculative or conjectural."[84] While the need for certainty of damages is somewhat less in negligence than in contract, "there [still] must be some reasonable basis upon which a jury may estimate with a fair degree of certainty the probable loss."[85] When a plaintiff fails to meet this burden, "the jury cannot supply the omission by speculation or conjecture."[86]

In claims involving harm to land, expert testimony is typically necessary.[87] The Court recognizes, in accordance with Delaware Rule of Evidence 701, that a lay

---

[79] *Id.*

[80] 22 Am. Jur. 2d Damages § 138 (explaining the availability of recovery for economic losses).

[81] Restatement (Second) of Torts § 929.

[82] *Id.* at cmt. on Subsection (1), Clause (a).

[83] Restatement (Second) of Torts § 912, cmt. a.

[84] *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964) (quoting *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958)).

[85] *Id.* (discussing the proof necessary for a "future consequence of a tortious injury").

[86] *Id.*

[87] Restatement (Second) of Torts § 912, cmt. c.

23

witness that is a record owner may testify to the harm caused to his or her property.[88] This record owner rule permits personal and real property owners to estimate the value of their property.[89] Nevertheless, "the witness landowner must be familiar with the elements of the property and have knowledge of the value of the property in order to testify."[90] Moreover, "[i]f the owner's perceptions of property value are based on scientific or specialized knowledge or skill, then they will rise to the level of an expert witness and will not be permitted to testify without appropriate notice to the parties and Court."[91] Here, an expert opinion would be necessary to quantify the remedial costs necessary to remedy the environmental harm that Costal allegedly caused.

Mr. Duncan proffers no expert testimony providing any estimate of monetary harm. Furthermore, there is no other evidence of record that could enable the trier of fact to fix money damages to a reasonable certainty. Mr. Duncan merely seeks to recover unidentified costs to remediate contamination that spread after Coastal's actions. Under his theory of the case, his harm includes the costs (1) to again remove the contaminated soil from the pits, (2) to remove any new fill Coastal used to supplement the volume of the tanks in the pits, and (3) to address migrated contaminants. He offers no expert testimony as to how much any of this would cost. At best, Mr. Duncan's expert estimated the size of the contamination as the volume of the tanks removed, without calculating that volume.[92] Furthermore, he did not identify the degree of migrated contaminants. He recognized that to do so would

---

[88] *PJ King Enterprises, LLC v. Ruello*, 2008 WL 4120040, at *2 (Del. Super. July 1, 2008).
[89] *Id.* (citing *Atwell v. RHIS, Inc.*, 2007 WL 625277, *1 (Del. Super. Feb.14, 2007) and *Wilson v. Pepper*, 1995 WL 562235, *5 (Del. Super. Aug. 21, 1995)).
[90] *Id.* (citing *Eastern Shore Nat. Gas Co. v. Glasgow Shopping Ctr. Corp.*, 2007 WL 3112476, at *2 (Del. Super. Oct. 3, 2007)).
[91] *Id.*
[92] Def. Service Energy App'x to Opening Brief, at A0505–06.

require additional sampling.[93] No additional sampling took place, or if it did, Mr. Grow did not consider the results when forming his opinion.[94]

Mr. Duncan attempts to excuse his lack of damages evidence by arguing that the initial contamination and Coastal's alleged spread of the contamination caused one indivisible injury. Delaware law recognizes that "when the negligent acts of two or more persons concur in producing a single indivisible injury, such persons are jointly and severally liable, though there was no common duty, common design, or concerted action."[95] The acts at issue may be "separated by time and space."[96]

Mr. Duncan argues that there is a genuine issue of fact concerning the injury's indivisibility. In doing so, he references his expert's opinion that returning the soil to the pits made the contamination worse. He also notes that DNREC identified a third project after the UST removal. Finally, he relies upon DNREC's Rule 30(b)(6) testimony that because only the same contaminants were involved in the new project, the deponent could not apportion the contamination between events.[97]

If Mr. Duncan had identified an expert opinion that the total contamination at the Site constituted an indivisible injury, a factual issue may have existed.[98] Mr. Grow's expert report and deposition testimony provide no such evidence, however. In fact, they directly contradict Mr. Duncan's indivisibility claim. Namely, Mr. Grow wrote that the contamination that Coastal caused in 2013 were *measurable*

---

[93] Pl. App'x to Answering Brief, at B0696.

[94] *Id.* at B0696–97.

[95] *Campbell v. Robinson*, 2007 WL 1765558, at *2 (Del. Super. June 19, 2007) (quoting *Leishman v. Brady*, 3 A.2d 118 (Del. Super. Dec. 20, 1928) and citing *Sears, Roebuck & Co. v. Huang*, 652 A.2d 568, 573 (Del.1995)).

[96] *Tull v. Friend*, 2015 WL 1202531, at *3 (Del. Super. Mar. 10, 2015) (citing *Stubbs v. Ringler*, 1998 WL 117284, at *3 (Del. Super. Oct. 6, 1998)).

[97] Pl. Answering Br., at 51–52.

[98] *See Stubbs*, 1988 WL 117284, at *3 (finding a factual issue existed "as to whether plaintiff's injuries are susceptible of division as between the defendant" where the evidence of record showed the damage to the plaintiff's knees constituted "a single, indivisible injury, which is not susceptible of separation or apportionment").

*and distinct*, though he did not measure them or elaborate on how they were distinct.[99]  Rather than support the premise that Mr. Duncan's injury is indivisible and thus unquantifiable other than when viewed as a whole with the preexisting contamination, Mr. Grow's opinion and testimony supports the opposite.  Namely, it provides that an amount and value could have been assigned had he or another expert conducted the necessary studies or investigation.  On summary judgment, it is Mr. Duncan's burden to identify facts supporting his damages.  He has no expert opinion to support his claim that Coastal and Service Energy are liable for the whole of the damages at the Site because of their indivisibility.

Other than Mr. Grow's opinion, Mr. Duncan cites only the amount that he settled with DNREC ($250,000) in support of his damages.   The total settlement amount between Mr. Duncan and DNREC for *all* of the investigation and remediation at the Site provides no certainty, much less reasonable certainty, as to how much of the $250,000 was caused by Coastal's alleged 2013 negligence.  Mr. Duncan does not identify a basis for a jury to assess damages other than through speculation or conjecture.

In sum, although the record evidence supports a reasonable inference of as to the elements of duty, breach, and causation of some harm, it does not regarding the element of damages.   His failure to demonstrate any quantifiable monetary damage—an essential element of a negligence claim in our civil justice system—requires summary judgment in favor of Coastal.  It follows that his vicarious claim against Service Energy must also be dismissed.  As a result, the Court need not address Service Energy's arguments regarding agency, or whether the 2009 Agreement's release would have separately barred Mr. Duncan's agency based claim against Service Energy.

---

[99] *See* Pl. App'x to Answering Brief, at B01105 (quantifying the contaminated new soil as being a "volume equal to the size of the tanks removed" without specifying that volume).

26

### D. Partial summary judgment in favor of Mr. Duncan on his rent claim is appropriate

Mr. Duncan seeks partial summary judgment on his contract claim against Service Energy for unpaid rent. In the three-party 2000 Agreement, New Dawn Energy assigned its existing 1994 master lease to Service Energy. Mr. Duncan, as the existing landlord, and Service Energy, as the new tenant, also exchanged further promises.

The lease required a $2,000 monthly rent payment in exchange for Service Energy's use of the Site. There is no dispute of fact that Service Energy breached the lease by withholding rent *unless*, for some reason, its non-payment was excused. Service Energy argues that its duty to perform was excused because Mr. Duncan first breached the 2009 Agreement.

In most cases, a party's performance may only be excused when the other party first materially breached the contract.[100] Furthermore, it is a general rule that "the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform."[101] To overcome this hurdle, plaintiffs must show their "freedom from fault with respect to performance of dependent promises, counter promises or conditions precedent."[102] The intent of the parties controls when determining whether a promise is dependent or independent of another promise.[103] Where the promises at issue are independent from one another, a plaintiff's breach does not estop him or her from prosecuting a breach of contract claim.[104]

---

[100] *Daystar Const. Mgmt., Inc. v. Mitchell*, 2006 WL 2053649, at *7 (Del. Super. July 12, 2006).

[101] *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Super. Mar. 20, 1969) (citing 17 Am. Jur. 2d Contracts § 365).

[102] *Id.*

[103] 17 Am. Jur. 2d Contracts §§ 670, 672.

[104] *See Allmand Associates, Inc. v. Hercules Inc.*, 960 F. Supp. 1216, 1235 (E.D. Mich. 1997) (distinguishing the holding in *Hudson* because it involved dependent promises, whereas the case at hand did not excuse performance because it involved independent promises).

The payment of rent is an important aspect of a lease agreement between a landlord and tenant. Likewise, negotiated financial responsibility following a settlement and release is essential to such an agreement's purpose. Here, the matter turns on whether Service Energy's obligation to pay rent under the lease was dependent upon Mr. Duncan's obligations under the 2009 Agreement.

At the outset, the parties' respective breaches arise out of separate agreements. Service Energy assumed responsibility to pay rent for the Site in the 2000 Agreement. Mr. Duncan separately accepted responsibility for environmental damage in the 2009 Agreement. Service Energy identifies no evidence of record supporting that its promise to pay rent depended upon Mr. Duncan's promise to accept financial responsibility for the environmental damage.

Service Energy's strongest argument is that it may have withheld rent based upon a provision in the 2000 Agreement that provided that "[t]he Landlord shall be responsible for and shall hold harmless STTCPL, L.L.C., from any claims for environment damage which has occurred prior to the time that they have become a tenant on the property."[105] However, in its own briefing, Service Energy concedes that the two agreements were separate and that it negotiated the 2009 Agreement because Mr. Duncan would not accept responsibility under the 2000 Agreement.[106] In any event, the 2009 Agreement was a wholly separate agreement.[107]

The plain language of the two agreements demonstrate no dependency. Namely, they (1) recite the parties' intent that the agreements stand alone, and (2) include other terms that demonstrate non-dependence.

---

[105] Def. Service Energy App'x to Opening Brief, at A0310.

[106] *See* Def. Service Energy Answering Brief, at 6 (explaining "when it appeared that negotiation was futile, [Service Energy] warned Duncan that it would suspend its performance under the 2000 Lease Agreement by redirecting rental payments towards the cost of DNREC compliance").

[107] *Id.* (explaining that before it needed to fulfill its threat to suspend performance, the parties "reached a settlement").

The 1994 master lease assumed by Service Energy provides:

> [a]ll rent and other payments fixed herein as to the amount and time of payment shall be paid without prior demand, and all rent and additional rent shall be paid without any set-off, abatement, or deduction, except as expressly set forth in this Lease.[108]

Furthermore, the 1994 master lease expressly prohibited Service Energy from withholding rent under these circumstances. First, the lease provides in paragraph 7 that a right of setoff was "intentionally omitted."[109] Furthermore, paragraph 10 in the lease provides the following:

> [a]ll rent and other payments fixed herein as to amount and time of payment shall be paid without prior demand, and *all rent and additional rent shall be paid without any set-off, abatement, or deduction, except as expressly set forth in this Lease*.[110]

Nowhere in the 1994 master lease are any of these remedies preserved. Service Energy assumed the 1994 master lease from New Dawn in 2000, and the 2000 Agreement did not modify or alter the above cited provisions.

Furthermore, while the 2009 Agreement references the 2000 Agreement in a whereas clause, it does not address the 2000 Agreement at any other location. The 2009 Agreement recites only a dependency of terms internal to that agreement. Namely, all internal citations to obligations in the 2009 Agreement address only "this Agreement."

In sum, where the parties' failed to perform their respective obligations under two separate agreements where the relevant promises did not depend upon one another, a party is not justified in breaching an independent obligation in the separate agreement. Accordingly, Mr. Duncan's rent claim against Service Energy is not estopped. Because there are no genuine issues of material fact regarding this issue,

---

[108] Pl. App'x to Answering Brief, at B01085.
[109] *Id.* at B01083.
[110] *Id.* at B01085 (emphasis added).

29

summary judgment must be granted in favor of Mr. Duncan for the $48,000 of withheld rent.

## E. On balance, neither party was the prevailing party for purposes of attorneys' fees.

Based on the cross-motions for summary judgment, the Court will address the parties' eligibility to recover attorneys' fees. Delaware law follows the "American Rule," which requires litigants to themselves defray the cost of being represented by counsel.[111] Furthermore, they are responsible for paying their own counsel fees in the absence of either statutory authority or a contractual provision requiring it.[112] This general rule and its exceptions apply to actions at law; they significantly limit the Court's authority to order the payment of attorneys' fees as costs.[113]

Where contract provisions contain language requiring one party to "prevail" to recover attorneys' fees, the Court must permit their recovery after determining the provision's intent.[114] The Court's initial step is to interpret the agreement to execute the parties' intent.[115] Namely, when reviewing contracts for "prevailing party" type language, courts must discern whether the parties intended (1) an all or nothing or (2) a claim-by-claim recovery.[116] For a claim-by-claim recovery, parties must insert "language in the contract that would authorize the court to exercise discretion to

---

[111] *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966). *See also Dover Historical Soc., Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1090 (Del. 2006) (explaining that "[a] court of equity has jurisdiction to award counsel fees as part of costs in a proper case, but in an action at law, absent a statutory or contractual provision, a court may not ordinarily order the payment of attorneys' fees as costs to be paid by the losing party").

[112] *Burge v. Fid. Bond & Mortgage Co.*, 648 A.2d 414, 421 (Del. 1994) (citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del. 1989)).

[113] *Casson v. Nationwide Ins. Co.*, 455 A.2d 361, 370 (Del. Super. Sept. 20, 1982).

[114] *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2018 WL 300454, at *2 (Del. Ch. Jan. 5, 2018) (describing previous case law involving "prevailing party" contract provisions).

[115] *Brandin v. Gottlieb*, 2000 WL 1005954, at *27–28 (Del. Ch. July 13, 2000).

[116] *Id.* at *27.

award less than 'all' the prevailing party's fees in a case where the prevailing party had achieved a less than full victory."[117]

In the absence of language permitting a claim-by-claim recovery, the Court analyzes the "predominance in the litigation" to determine which party prevailed.[118] To establish predominance, the party must prevail on the case's chief issue.[119] There are circumstances where "no party may be regarded as having prevailed."[120] There also can be more than one chief issue in a case. Where the parties split their success in such circumstances, the Court may find that neither party prevailed.[121]

The relevant provision in the 2009 Agreement provides that:

> the parties agree that the reasonable and actual out-of-pocket costs, fees and expenses incurred by either party in connection with the successful enforcement of this agreement, including all reasonable attorneys' fees, are recoverable.[122]

The provision does not include a term that permits the award of less than all of a partially prevailing party's fees. Instead, the provision provides for recovery of fees incurred "in connection with the successful enforcement of [the 2009 Agreement]."[123] Absent language in this provision permitting a claim-by-claim analysis, a predominance in the litigation analysis is appropriate. It must be all or nothing.

---

[117] *Id.* at *28.

[118] *Mrs. Fields*, 2018 WL 300454, at *2 (citing *Brandin*, 2000 WL 1005954, at *28).

[119] *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *33 (Del. Ch. Oct. 14, 2015) (citing *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC*, 2009 WL 458779, at *9 (Del. Ch. Feb. 23, 2009)).

[120] *Vianix Delaware LLC v. Nuance Commc'ns, Inc.*, 2010 WL 3221898, at *28 (Del. Ch. Aug. 13, 2010) (finding that because "each side prevailed on a number of issues," including successful defenses and recovery for damages much less than claimed, there was no prevailing party and declining all requests for attorneys' fees).

[121] *Mrs. Fields*, 2018 WL 300454, at *3.

[122] Def. Service Energy App'x to Opening Brief, at A0004.

[123] Although the 2009 Agreement included the phrase "successful enforcement" rather than "prevailing party," the Court finds no reason why this language should require a different analysis.

31

With regard to the litigation focused on the 2009 Agreement, the Court finds two chief issues: (1) Mr. Duncan's environmental damages claim, and (2) Service Energy's counter-claim for indemnification. Considering the results of the parties' summary judgment motions, the parties split their success. Namely, both parties succeeded as to one chief issue, but failed as to the other. Service Energy succeeded in its own summary judgment motion, defeating Mr. Duncan's claims. Likewise, Mr. Duncan succeeded with regard to Service Energy's indemnification claim.

Because Service Energy and Mr. Duncan each won and lost a chief issue in this case, on balance, there can be no finding that either predominated in the litigation so as to be the "prevailing party." Accordingly, neither party is entitled to attorneys' fees.

## V.      Conclusion

For the reasons discussed, Service Energy's Motion for Summary Judgment must be **GRANTED** as to Mr. Duncan's environmental damages claim. Coastal's Motion for Summary Judgment must also be **GRANTED**. Mr. Duncan's Motion for Partial Summary Judgment must be **GRANTED** with regard to the withheld rent and with regard to Service Energy's indemnification counterclaim.

Accordingly, judgment is hereby entered on behalf of Plaintiff Robert Duncan and against Defendant STTCPL, LLC (the signatory to the 2000 Agreement) in the amount of $48,000. Judgment is separately entered in favor of Defendant Coastal Pump and Tank, Inc. and against Plaintiff Robert Duncan. All parties shall bear their own costs and attorneys' fees.

  **IT IS SO ORDERED.**

/s/Jeffrey J Clark
Judge

JJC:jb
*Via File & Serve Xpress*

32